### COMMONWEALTH OF MASSACHUSETTS, Plaintiff,

v.

### Margaret HECKLER et al., Defendants.

### Civ. A. No. 83–2523–G.

United States District Court,
D. Massachusetts.

Aug. 27, 1985.

Thomas A. Barnico, Asst. Atty. Gen., Boston, Mass., for plaintiff.

Karen M. Green, Asst. U.S. Atty., Boston, Mass., for defendants.

## MEMORANDUM AND ORDERS ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

GARRITY, District Judge.

In this action, the Commonwealth of Massachusetts ("Commonwealth") seeks review of a May 31, 1983 decision of the Department Grant Appeals Board ("the Board") of the Health Care Financing Administration ("HCFA") of the Department of Health and Human Services ("HHS"), which held that certain services provided to persons residing in state-owned intermediate care facilities for the mentally retarded ("ICF/MRs") were not eligible for reimbursement under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* ("the Medicaid program"). The Board disallowed $6,414,964 in federal financial participation ("FFP") advanced to the Commonwealth between July 1, 1978 and December 31, 1980, claiming that those costs were incurred by the Commonwealth in providing educational services and were therefore not reimbursable under the Medicaid program. The Commonwealth contests this decision, claiming that the services in question are reimbursable under Medicaid. Jurisdiction is based on 28 U.S.C. § 1331. The parties have filed cross-motions for summary judgment. After hearing oral argument and considering the briefs and administra-

tive record,[1] the court grants the Commonwealth's motion for summary judgment and denies defendants' motion.

## I. *Relevant Statutory and Regulatory Background*

The Medicaid program, created in 1965, is designed to assist states in providing "(1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396. Under the Medicaid program, such services are financed in part by federal grants to participating states which have submitted, and had approved by the Secretary of HHS, state plans for medical assistance. *Id.* The federal government pays a certain percentage of the total cost of Medicaid services, and the balance is paid by the state. 42 U.S.C. § 1396b(a).[2]

In 1971, Congress included in the Medicaid program "intermediate care facility services." 42 U.S.C. § 1396d(a)(15). An ICF is defined as

an institution which is (1) licensed under state law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and service (above the level of room and board) which can be made available to them only through institutional facilities, (2) meets such standards prescribed by the Secre-

tary as he finds appropriate for the proper provision of such care, and (3) meets such standards of safety and sanitation as are established under regulation of the Secretary in addition to those applicable to nursing facilities under State law....

42 U.S.C. § 1396d(c). 42 U.S.C. § 1396d(d) provides the following:

(d) Intermediate care facility services

The term "intermediate care facility services" may include services in a public institution (or distinct part thereof) for the mentally retarded or persons with related conditions if—

(1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and which meet such standards as may be prescribed by the Secretary;

(2) the mentally retarded individual with respect to whom a request for payment is made under a plan approved under this subchapter is receiving active treatment under such a program; and

(3) the State or political subdivision responsible for the operation of such institution has agreed that the non-Federal expenditures in any calendar quarter prior to January 1, 1975, with respect to services furnished to patients in such institution (or distinct part thereof) in the State will not, because of payments made under this subchapter, be reduced below the average amount expended for such services in such institution in the four quarters immediately preceding the quarter in which the State in which such institution is located elected to make

---

**1.** Included in the administrative record ("A.R.") is a video tape exhibit submitted by the Commonwealth which depicts the services provided to a sample of individuals who reside in Belchertown State Hospital, an ICF/MR. The court viewed the entire video tape, which is forty-five minutes in length, in chambers, having borrowed a television and video cassette recorder from the Probation Office of the court.

**2.** Federal Medicaid grants are awarded to each participating state prospectively, based on an estimate provided by the state each quarter

year. 42 U.S.C. § 1396b(d). Following each quarter, the state submits a report of its actual expenditures and the next quarter's grant is adjusted accordingly. The HCFA reviews state reports of expenditures and may disallow FFP when it determines that an expenditure is not reimbursable under the Medicaid program. Administrative review of a disallowance is available in the form of a request for reconsideration by the Board. 42 U.S.C. § 1316(d). Decisions of the Board are then reviewable in a United States District Court.

such services available under its plan approved under this subchapter.

Under the Social Security Act, the Secretary of HHS is authorized to promulgate rules and regulations, not inconsistent with the Act, as are necessary to the efficient administration of her functions under the Act. 42 U.S.C. § 1302. Pursuant to this authority, the Secretary promulgated 42 C.F.R. § 441.13(b), which provides the following:

> Payments to institutions for the mentally retarded or persons with related conditions and to psychiatric facilities or programs providing inpatient psychiatric services to individuals under age 21 may not include reimbursement for vocational training and educational activities.

## II. *State Background*

The Commonwealth has participated in the Medicaid program since 1966. The Massachusetts Department of Public Welfare is responsible for administering the Massachusetts plan. The Massachusetts Department of Mental Health ("DMH") operates the state-owned ICF/MRs certified to participate in the Medicaid program. As an ICF/MR operator, the DMH is responsible for complying with the statutory and regulatory requirements of ICF/MRs under the Medicaid program. In particular, the DMH must ensure that all mentally retarded individuals residing in ICF/MRs are receiving active treatment, in accordance with 42 U.S.C. § 1396d(d)(2). Under the Secretary's regulations, "active treatment" requires among other things that these individuals regularly participate in "professionally developed and supervised activities, experiences or therapies" and that each individual receive an "individual written plan of care", known as an "ISP" (Individual Service Plan), which sets forth measurable goals or objectives and an integrated program of activities or therapies designed to achieve those goals. 45 C.F.R. § 435.1009. According to the regulation, "[t]he overall purpose of the plan is to help the individual function at the greatest physical, intellectual, social, or vocational level he can presently or potentially achieve." 42 C.F.R. § 435.1009(b).

Pursuant to state law, the Commonwealth is also required to provide special education to all school age children with special needs in Massachusetts. Chapter 766 of the Acts of 1972, M.G.L. c. 71B ("Chapter 766"). Special education is defined as "everything which is required to be provided to a child in need of special education pursuant to the IEP." Chapter 766 Regulations, 122.0. The IEP (Individual Education Plan), which is prepared for each Massachusetts child with special needs, describes the child's educational abilities and goals and sets forth methodologies and teaching approaches designed to meet these goals. *See* Chapter 766 Regulations, § 322.0.

Section 12 of Chapter 766 requires that the Department of Education ("DOE") establish and maintain a school department for school-age children in each ICF/MR and provide services jointly with the DMH. M.G.L. c. 71B, § 12. The director and staff of such school departments are employees of the DOE, which is responsible for the costs of all aspects of the educational programs in the ICF/MRs. *Id.* The Bureau of Institutional Schools ("BIS") of the Division of Special Education of the DOE is responsible for administering the educational programs at ICF/MRs pursuant to Chapter 766. Chapter 766 Regulations, § 700.0.

The Commonwealth, in an effort to comply with both state and federal law concerning the treatment of the mentally retarded at ICF/MRs and to promote efficiency, has consolidated the administration of the services provided by the DMH pursuant to the "active treatment" requirement of Medicaid and the services provided by the BIS pursuant to Chapter 766. Each individual residing in an ICF/MR who is required to have an annual ISP developed in accordance with the Medicaid regulations and an annual IEP developed in accordance with Chapter 766, is evaluated annually through a "Joint Review Process", in which DMH and BIS staff develop

a joint plan meeting the requirements of federal and state law. The DMH then delegates the services required in each individual's plan to the appropriate professional groups. The Commonwealth also utilizes a "Transdisciplinary Approach" in its staffing. This approach encourages "role release" by different professionals, or the sharing of one's expertise with others of different professions, in order to consolidate the staff and to ensure continuity and consistency in the delivery of services to these individuals.

Concerned that in providing the services to individuals at ICF/MRs there would be difficulty distinguishing between payments for services which are reimbursable under the Medicaid program and those which are not, the Commonwealth sought clarification from the regional Medicaid office of HHS and received an interpretative bulletin, Action Transmittal HCFA–AT–78–104 ("the Action Transmittal") in response (attached as Appendix 1). The Action Transmittal, dated November 29, 1978, was issued by HHS in an effort to clarify the relationship between the Medicaid program and the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1400 *et seq.* ("EAHCA") with respect to services provided to individuals residing at ICF/MRs. Briefly, EAHCA requires that in order to qualify for federal education assistance under the statute, the state must assure all handicapped children the right to a free appropriate public education. 20 U.S.C. § 1412(1).[3] Free appropriate public education consists of "special education" and "related services". 20 U.S.C. § 1401(18). The term special education is defined as

specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction and instruction in hospitals and institutions.

20 U.S.C. § 1401(16). The term related services is defined as

transportation, and such developmental, corrective and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17). EACHA allows for federal funding for related services if they are provided by the state to individuals free of charge. 34 C.F.R. § 300.14(a)(2)

The Action Transmittal acknowledges that in providing services to individuals at ICF/MRs, "it is difficult to clearly differentiate between a habilitative ... and an educational service." In a letter accompanying the transmittal, an attorney for HCFA states that while academic education (reading, writing, etc.) and vocational training are not eligible for FFP under the Medicaid program, "training in 'the activities of daily living' (such as dressing and feeding oneself) are both required and reimbursable under Title XIX." However, according to the Action Transmittal, some services may constitute both habilitative services under Medicaid and related services under EACHA. Therefore, it states that these habilitative services may be reimbursable under Medicaid even though they are also considered to be related services in an individual's IEP. Furthermore, states may develop "consolidated" IEPs and ISPs for individuals whose Medicaid and educational services overlap. However, the transmittal also states that "[i]f [the] state statute extends responsibility for payment of specific health services to the education agency, then the Medicaid Agency cannot pay for those services." Finally, the Action Trans-

---

**3.** Chapter 766, which was enacted three years before the federal statute, provides such assur-

ance in Massachusetts.

mittal explained that the purpose of 42 C.F.R. § 441.13 in excluding education and vocational activities from Medicaid coverage was "to assure nonduplication of federal funds."[4]

The Commonwealth determined that all of the services rendered by the DMH and BIS to individuals at the ICF/MRs were eligible for reimbursement under Title XIX. The Secretary, however, disallowed all costs incurred by the BIS in providing services at ICF/MRs as non-reimbursable education services. Specifically, the following BIS costs were disallowed:

1. Activities funded under Title I of the Elementary and Secondary Education Act, P.L. 89–10;[5]

2. Service delivery contracts with educational collaboratives and one regional vocational school entered into by the BIS to provide specific services required by Chapter 766 regulations which could not be provided by existing state personnel;

3. Contracts for personnel to perform evaluation and monitoring functions required by Chapter 766; and

4. State-salaried personnel of the Department of Education, including institution school teachers and instructional aides, who, as required by Chapter 766, service ICF/MR residents in accordance with documented goals stated in IEPs.

### III. Findings and Conclusions[6]

■ We hold that the services provided by the BIS in ICF/MRs are eligible for reimbursement under the Medicaid program. The types of services provided by the BIS to these mentally retarded individuals fall clearly within the category of habilitative services explicitly covered by Title XIX. 42 U.S.C. § 1396.

In making this decision, the court relies to a great extent on the video tape described in footnote 1 *ante* and on the case study of Client "B" described in the Commonwealth's memorandum in support of its motion for summary judgment. Client "B" is profoundly retarded, as well as severely physically handicapped. Because B has extreme difficulty in interacting with his environment, i.e., he is virtually unable to respond to visual or auditory activity, his ISP and IEP goals as of 1980 largely involved the stimulation of B's senses to increase his awareness of his surroundings. B's curriculum at his day program, which was located outside his ICF/MR and was staffed by the BIS, included learning to signal for food when he was ready to eat to prevent aspiration of food into his lungs by controlling the speed at which he was fed; attending auditory stimulation for two minutes; locating hidden objects; showing preference for certain objects presented; and encouraging social interactions with adults.[7]

The video tape depicts nine Belchertown State School residents performing various exercises under the supervision of BIS staff.[8] For example, these exercises include training different individuals to respond to visual stimuli, to turn on a radio

---

4. Defendants now reject non-duplication of funding as the purpose behind the regulation.

5. Prior to the issuance of the HCFA disallowance notice, the Commonwealth agreed to reduce from its claim for reimbursement those costs for which it had received reimbursement already under Title I. According to defendants these costs amounted to $67,800, of which the federal share was $35,090. Therefore the disallowance in category 1 above is not disputed by the Commonwealth.

6. This case presents questions of both fact and law. Findings of fact of the Board are reviewable by this court under the "substantial evidence" standard. *State of Minnesota v. Heckler,*

8 Cir.1983, 718 F.2d 852, 860. Questions of law are to be resolved by the court. *Id.*

7. The Secretary suggests that Client "B" is not representative of the individuals who receive services from the BIS because he was the most severely handicapped of all the individuals whose cases were audited by HHS. However, she does not dispute the fact that she disallowed the services provided to B as "educational", a position we find untenable.

8. The court was aided in understanding these exercises by the testimony of Linda Brown before the Board on March 17, 1983 (A.R. 1278–1315).

with an adaptive switch, to remember the letters in one's name, to ask for a drink by reaching out with a cup, to eat with a spoon, and to sort out objects. We hold that these services, which we believe are representative of the services generally provided by BIS staff, are covered by the Medicaid program.

The purpose of Medicaid is to provide medical assistance to eligible individuals *as well as* "rehabilitation and other services to help ... such individuals attain ... capability for independence or self-care." 42 U.S.C. § 1396. Medicaid coverage is not limited to purely medical assistance, but was "'designed to alleviate the cost of health care which is active and remedial rather than custodial in nature.'" *State of Minnesota v. Heckler*, 8 Cir.1983, 718 F.2d 852, 864 (citing *Legion v. Richardson*, S.D. N.Y., 354 F.Supp. 456, 459, *aff'd sub nom. Legion v. Weinberger*, 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973) ).

■ ICF/MRs were included in the Medicaid program in 1971 for that same purpose, viz., to provide "health or rehabilitative services for mentally retarded individuals." 42 U.S.C. § 1396d(d)(1). By this amendment to the Medicaid statute, Congress sought to remove the mentally retarded from mental hospitals and skilled nursing homes, where the services are largely custodial, to institutions in which the primary objective is the provision of health and rehabilitative services to enable these individuals to achieve some degree of self-care. *See* Report of Senate Finance Committee printed in Statement of Sen. Long, 117 Cong.Rec. 44721 (1971). As stated by Senator Bellman:

Mental retardation is not, in most instances, a condition which responds to treatment. However, there are public institutions whose primary objective is the active provision of rehabilitative, educational and training services to enhance the capacity of mentally retarded individuals to care for themselves or to engage in employment. Public institutions whose primary objective is the provision of health services or rehabilitative services to the mentally retarded should be subject to Federal participation under adequate safeguards.

117 Cong.Rec. 44720 (1971). Therefore, within the Medicaid statute and its legislative history we find clear Congressional intent to provide Medicaid coverage for the types of habilitative services provided by the BIS.[9]

The Board concurred in the decision of HHS that these BIS costs were incurred for "educational activities" within the meaning of 42 C.F.R. § 441.13(b). The basis for this decision is essentially that these services were provided by the Commonwealth pursuant to Chapter 766 through the DOE in accordance with each individual's IEP.

■ Regulations section 441.13(b) is consistent with the purposes of the Medicaid program. Medicaid was not designed to cover traditional educational services;[10] rather, as stated *ante*, its purpose is to provide those treatments, therapies, and other programs necessary to enable disabled individuals to gain some degree of independence in performing "the activities of daily living." In our opinion, section 441.13(b) was inappropriately applied in this case. In particular HHS defined "edu-

---

**9.** We do not agree with the Commonwealth that all services provided pursuant to the "active treatment" requirement of 42 U.S.C. § 1396d(d)(2) and 42 C.F.R. § 435.1009 are reimbursable under Medicaid. The active treatment language of the statute demands that residents at ICF/MRs participate in regular programs and therapies. The purpose of this requirement is to avoid coverage for purely custodial services. In our opinion, active treatment is a condition placed on ICF/MRs under the Medicaid statute. However, we find that the

"health and rehabilitative services" language of § 1396d(d)(2) describes the types of services covered by the Medicaid program.

**10.** Federal education assistance is provided to the states through Title I of the Elementary and Secondary Education Act of 1965, P.L. 89–10; the Elementary and Secondary Education Amendments of 1969, P.L. 91–230; and the Education for All Handicapped Children Act of 1975, P.L. 94–142.

cation" by reference to state and federal education statutes and to the Commonwealth's method of administering the services in question, rather than to the nature of the services themselves. This approach errs on the side of administrative convenience at the expense of compliance with the Medicaid statute in our view.

Section 441.13(b) does not define "educational activities." The services provided by the BIS, involving for the most part therapies designed to train the mentally retarded to function at some minimal level in society, cannot be defined as "traditional" or "academic" education, which clearly would be excluded under the regulation. Yet these Medicaid covered services could perhaps be described as "special education" or "related services" as defined by Chapter 766 or EACHA. *See Abrahamson v. Hershman*, 1 Cir.1983, 701 F.2d 223, 228. On that basis, HHS would have them excluded from Medicaid coverage under section 441.13(b).

■ However, section 441.13 does not state that the costs of all services which are provided pursuant to a state education statute and paid for by the state are not reimbursable under the Medicaid program; rather, it states only that the costs of "educational activities" are not reimbursable. The Massachusetts and federal education statutes define special education extremely broadly. *See Abrahamson, supra*. But the fact that these services might be classified as "education", "special education" or "related services" under other statutes, particularly a state statute, is not dispositive of the classification of these services for the purposes of the Medicaid statute nor the regulations promulgated thereunder. "[A] word used in one statute does not necessarily have the same meaning in another statute." *Complaint of Tracey*, D.Mass.1985, 608 F.Supp. 263, 268. Edu-

cation is normally more narrowly defined. It connotes a more traditional, academic discipline. All training or instruction is not education in our view. The simple skills being taught to the individuals at these institutions, particularly those shown on the videotape and being taught to Client "B", are certainly not educational in the traditional sense of the word.[11]

Furthermore the court has found *ante* that these services are covered by the Medicaid program because they are habilitative in nature.[12] Section 441.13(b) may not be used by HHS to take out of the coverage of Medicaid those services explicitly covered by the statute. Therefore, we reject the position of HHS that Medicaid coverage is not available for services covered by state education statutes.

The fact that these services are provided by an agency of the Commonwealth's education department does not bar their classification as Medicaid covered habilitative services. As explained by the Commonwealth, each individual in an ICF/MR is evaluated annually by DMH and BIS staff together and is given a joint plan of care, which includes his or her ISP and IEP. In fact, many of the services required under these individuals' ISPs and IEPs are similar or identical, which is understandable in light of 45 C.F.R. § 435.1009, which states that the overall purpose of the ISP is to help the individual function "at the greatest physical, intellectual, social, or vocational level he can presently or potentially achieve." Under its Transdisciplinary Approach, the programs and therapies required by these plans are provided by both DMH and BIS staff in an integrated fashion. This technique employed by the Commonwealth was specifically endorsed by HHS in its Action Transmittal. Given this Transdisciplinary Approach, HHS's deci-

---

**11.** The Commonwealth claims that the services in question do not constitute "education" because they do not aid these individuals in progressing from one "cognitive" level to another (Commonwealth's brief, p. 37). That analysis may be a more technical way to characterize what we have described in lay terms.

**12.** We agree with the Commonwealth that many of the services described in the videotape and in the Commonwealth's brief seem to be designed to aid these individuals in overcoming their health-related disabilities and therefore could be categorized as health services.

sion to disallow all services provided by the BIS pursuant to IEPs, while allowing similar services provided by the DMH pursuant to ISPs, is arbitrary in our opinion and is also not supported by substantial evidence.

Finally, we find that the Commonwealth was justified in seeking FFP for the costs incurred by the BIS under categories 2, 3 and 4 listed on page nine of this opinion. All of the costs listed in these categories were expended by the Commonwealth in administering the programs and providing the services to ICF/MR residents which we have held are covered by the Medicaid program.

### Conclusion

The Commonwealth is entitled to FFP under the Medicaid program for the costs incurred by the BIS at ICF/MRs. Therefore, the Commonwealth's motion for summary judgment is granted and defendants' cross-motion for summary judgment is denied.[13]

---

**13.** Counsel shall endeavor to stipulate and file a form of judgment consistent herewith as soon

as practicable.