## BOWEN, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. v. MASSACHUSETTS

No. 87–712.   Argued April 20, 1988—Decided June 29, 1988*

---

*Together with No. 87–929, *Massachusetts* v. *Bowen, Secretary of Health and Human Services, et al.,* also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 912. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined, *post*, p. 913.

*Roy T. Englert, Jr.*, argued the cause for petitioners in No. 87–712 and respondents in No. 87–929. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Spears, Deputy Solicitor General Merrill, William Kanter*, and *Howard S. Scher*.

*Thomas A. Barnico*, Assistant Attorney General of Massachusetts, argued the cause for respondent in No. 87–712 and petitioner in No. 87–929. With him on the brief were *James M. Shannon*, Attorney General, and *William L. Pardee*, Assistant Attorney General.†

---

†Briefs of *amici curiae* were filed for the State of Alabama et al. by *Charles A. Miller* and *Bruce N. Kuhlik*, and by the Attorneys General for their respective States as follows: *Grace Berg Schaible* of Alaska, *Joseph I. Lieberman* of Connecticut, *Warren Price III* of Hawaii, *J. Joseph Curran, Jr.*, of Maryland, *Frank J. Kelley* of Michigan, *David L. Wilkinson* of Utah, and *Charles G. Brown* of West Virginia; for the State of California

JUSTICE STEVENS delivered the opinion of the Court.

The principal question presented by these cases is whether a federal district court has jurisdiction to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program. All of the Courts of Appeals that have confronted this precise question have agreed that district courts do have jurisdiction in such cases.[1] We implicitly

by *John K. Van de Kamp*, Attorney General, and *John J. Klee, Jr.*, Deputy Attorney General; for the State of New York by *Robert Abrams*, Attorney General, *O. Peter Sherwood*, Solicitor General, *Lawrence S. Kahn*, Deputy Solicitor General, and *Lillian Z. Cohen* and *Mary Fisher Bernet*, Assistant Attorneys General; for the Council of State Governments et al. by *Benna Ruth Solomon*, *Joyce Holmes Benjamin*, and *Barry Sullivan;* and for Victoria Grimesy et al. by *Richard Rothschild*.

[1] Five Circuits have held that district courts have jurisdiction over a State's appeal from a federal administrative disallowance in a grant-in-aid program. *Massachusetts v. Secretary of Health and Human Services*, 816 F. 2d 796 (CA1 1987) (case below); *Maryland Dept. of Human Resources v. Department of Health and Human Services*, 246 U. S. App. D. C. 180, 763 F. 2d 1441 (1985) (action for wrongful disallowance of Title XX moneys is one for specific relief, and therefore not barred by 5 U. S. C. § 702's "money damages" exception; such an action is not cognizable in Claims Court because Title XX, 95 Stat. 867, 42 U. S. C. § 1397, although mandating payment by the United States for certain programs and services, does not create a cause of action for compensation for damages sustained by a State); *Minnesota ex rel. Noot v. Heckler*, 718 F. 2d 852 (CA8 1983) (District Court's prospective order upheld, money judgment vacated); *Illinois Dept. of Public Aid v. Schweiker*, 707 F. 2d 273 (CA7 1983) (district court, not court of appeals, is proper forum for review of disallowance under 42 U. S. C. § 1316(d); 5 U. S. C. §§ 702 and 704 issues not addressed); *County of Alameda v. Weinberger*, 520 F. 2d 344 (CA9 1975) (disallowances by Department of Health, Education, and Welfare of asserted overpayments to California pursuant to Titles I, X, and XIV of the Social Security Act are reviewable in district court even though 42 U. S. C. § 1316(d) does not specifically authorize judicial review; §§ 702 and 704 issues not addressed). In a case involving a federal grant program but not concerning a situation such as the one at bar, the Federal Circuit has held the Claims Court to be the proper tribunal to resolve administrative appeals. *Chula Vista City School Dist. v. Bennett*, 824 F. 2d 1573 (1987) (claim that Federal

answered the question in the same way when we accepted jurisdiction and decided the merits in *Connecticut Dept. of Income Maintenance* v. *Heckler*, 471 U. S. 524 (1985). Moreover, although the Medicaid program was established in 1965, the novel proposition that the Claims Court is the exclusive forum for judicial review of this type of agency action does not appear to have been advocated by the Secretary until this case reached the Court of Appeals. As we shall explain, the conclusion that the District Court had jurisdiction in these cases is supported by the plain language of the relevant statutes, their legislative history, and a practical understanding of their efficient administration. Before turning to the legal arguments, however, it is appropriate to say a few words about the mechanics of the federal financial participation (FFP) in the States' Medicaid programs and the character of the issue decided by the District Court.

I

In 1965 Congress authorized the Medicaid program by adding Title XIX to the Social Security Act, 79 Stat. 343. The program is "a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris* v. *McRae*, 448 U. S. 297, 308 (1980). Subject to the federal standards incorporated in the statute and the Secretary's regulations, each participating State must develop its own program describing conditions of eligibility and covered services. At present, 18 different categories of medical assistance are authorized. See *Connecticut Dept. of Income Maintenance* v. *Heckler*, 471 U. S., at 528–529.

Although the federal contribution to a State's Medicaid program is referred to as a "reimbursement," the stream of revenue is actually a series of huge quarterly advance pay-

Government had misconstrued federal law providing funding to local school districts, where result would be increased payments to plaintiff district, held properly in Claims Court), cert. denied, 484 U. S. 1042 (1988).

ments that are based on the State's estimate of its anticipated future expenditures.[2] The estimates are periodically adjusted to reflect actual experience. Overpayments may be withheld from future advances or, in the event of a dispute over a disallowance, may be retained by the State at its option pending resolution of the dispute.[3]

[2] Title 42 U. S. C. § 1396b(d) (1982 ed., Supp. V) provides, in part:

"(d) Estimates of State entitlement; installments; adjustments to reflect overpayments or underpayments; time for recovery or adjustment; uncollectable or discharged debts; obligated appropriations; disputed claims

"(1) Prior to the beginning of each quarter, the Secretary shall estimate the amount to which a State will be entitled under subsections (a) and (b) of this section for such quarter, such estimates to be based on (A) a report filed by the State containing its estimate of the total sum to be expended in such quarter in accordance with the provisions of such subsections, and stating the amount appropriated or made available by the State and its political subdivisions for such expenditures in such quarter, and if such amount is less than the State's proportionate share of the total sum of such estimated expenditures, the source or sources from which the difference is expected to be derived, and (B) such other investigation as the Secretary may find necessary.

"(2)(A) The Secretary shall then pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to such State for any prior quarter and with respect to which adjustment has not already been made under this subsection."

[3] Title 42 U. S. C. § 1396b(d)(5) provides:

"(5) In any case in which the Secretary estimates that there has been an overpayment under this section to a State on the basis of a claim by such State that has been disallowed by the Secretary under section 1316(d) of this title, and such State disputes such disallowance, the amount of the Federal payment in controversy shall, at the option of the State, be retained by such State or recovered by the Secretary pending a final determination with respect to such payment amount. If such final determination is to the effect that any amount was properly disallowed, and the State chose to retain payment of the amount in controversy, the Secretary shall offset, from any subsequent payments made to such State under this subchapter, an amount equal to the proper amount of the disallowance plus interest on such amount disallowed for the period beginning on the date such amount was disallowed and ending on the date of such final determina-

Two procedures are available to the Secretary if he believes that a State's expenditures do not comply with either the Act or his regulations. First: If he concludes that the State's administration of its plan is in "substantial noncompliance" with federal requirements, he may initiate a compliance proceeding pursuant to 42 U. S. C. § 1316(a); in such a proceeding he may order termination of FFP for entire categories of state assistance, or even (theoretically) the entire state program.[4] Should the Secretary subsequently conclude that his initial determination was incorrect, the statute provides that "he shall certify restitution forthwith in a lump sum of any funds incorrectly withheld or otherwise denied." § 1316(c). A final order in a compliance proceeding is reviewable in the "United States court of appeals for the circuit in which such State is located." § 1316(a)(3). Second: The Secretary may "disallow" reimbursement for "any item or class of items." § 1316(d). "In general, . . . a disallowance represents an isolated and highly focused inquiry into a State's operation of the assistance program."[5] The statute does not expressly provide for judicial review of a disallowance order. In several cases a State has sought direct review of a disallowance order in a Court of Appeals, but in each such case the court has concluded that the State should proceed in the district court. See *Illinois Dept. of Public Aid* v. *Schweiker*, 707 F. 2d 273 (CA7 1983), and cases cited therein.

Massachusetts has participated in the Medicaid program continuously since 1966. One of the categories of assistance covered by the Massachusetts program is the provision of medical and rehabilitative services to patients in intermedi-

---

tion at a rate (determined by the Secretary) based on the average of the bond equivalent of the weekly 90-day treasury bill auction rates during such period."

[4] See *Massachusetts Dept. of Public Welfare*, No. 82–169, Decision No. 438, Health and Human Services Grant Appeals Board (May 31, 1983), App. to Pet. for Cert. 78a.

[5] *Ibid.*

ate care facilities for the mentally retarded (ICF/MR services).[6] These services include such matters as "'training in "the activities of daily living" (such as dressing and feeding oneself),'" *Massachusetts* v. *Heckler*, 616 F. Supp. 687, 691 (Mass. 1985) (citation omitted) (case below), and are performed jointly by personnel from the State Departments of Mental Health and Education, working pursuant to state mental health and "special education" laws. See *Massachusetts* v. *Secretary of Health and Human Services*, 816 F. 2d 796, 798 (CA1 1987) (case below). Although the Secretary apparently would have regarded these services as covered had they been performed solely by the Massachusetts Department of Mental Health, his auditors classified them as uncovered educational services because they were performed in part by employees of the State Department of Education.[7] On August 23, 1982, the Regional Administrator of the De-

---

[6] An "intermediate care facility" is "an institution which . . . is licensed under State law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities." 42 U. S. C. § 1396d(c)(1). "'Intermediate care facility services' may include services in a public institution . . . for the mentally retarded or persons with related conditions if—(1) the primary purpose of such institution . . . is to provide health or rehabilitative services for mentally retarded individuals . . . ." § 1396d(d)(1).

The Federal Government contributed $546 million to Massachusetts for ICF/MR services during the years 1978–1982. Letter from Anthony Parker, Statistician, Division of Medicaid Statistics, Department of Health and Human Services, dated June 14, 1988 (available in Clerk of Court's case file). Since this amount is only a fraction of the Federal Government's total Medicaid contribution to the State for those years—which amounted to nearly $5 billion, see *ibid.*—it is apparent that, as the Secretary's Grant Appeals Board noted, the disallowances at issue in this case affected only "a proportionally small amount" of the federal subsidy. App to Pet. for Cert. 80a.

[7] See 816 F. 2d, at 802; *Massachusetts* v. *Heckler*, 616 F. Supp. 687, 693–695 (Mass. 1985) (case below).

partment's Health Care Financing Administration (HCFA) notified the State that he had disallowed $6,414,964 in FFP for the period July 1, 1978, to December 31, 1980. See App. to Pet. for Cert. 97a.[8] The Departmental Grant Appeals Board affirmed this decision on May 31, 1983. *Id.*, at 53a.[9]

On August 26, 1983, the State filed a complaint in the Federal District Court for the District of Massachusetts. The State's complaint invoked federal jurisdiction pursuant to 28 U. S. C. § 1331 and alleged that the United States had waived its sovereign immunity through 5 U. S. C. § 702. The complaint requested declaratory and injunctive relief and specifically asked the District Court to "set aside" the Board's order.[10] While the case was pending, on August 20, 1984, the HCFA notified the State of a $4,908,994 FFP disallowance for the same category of ICF/MR services based on its audit of the period January 1, 1981, through June 30,

---

[8] The record does not tell us whether the State then elected to retain the amount in dispute pending a final review of the agency's preliminary decision, as authorized by § 1396b(d)(5), see n. 3, *supra.* The HCFA notification of disallowance informed the State that it had one month to decide whether to retain the funds. See 3 Record 363. The State's appeal to the Board, filed one month later, is silent on the issue of funds retention. See *id.*, at 356–359.

[9] Thereafter, the Secretary was entitled to withhold the disputed amounts from its next quarterly payment to Massachusetts. Whether it in fact did so, or indeed, whether the next quarterly payment was made before the State commenced these actions in the United States District Court for the District of Massachusetts to obtain review of the Board's order, is not clear from the record.

[10] The complaint requested the following relief:

"Wherefore, the plaintiff requests that this Court grant the following relief:

"1. Enjoin the Secretary and the Administrator from failing or refusing to reimburse the Commonwealth or from recovering from the Commonwealth the federal share of expenditures for medical assistance to eligible residents of intermediate care facilities for the mentally retarded.

"2. Set aside the Board's Decision No. 438.

"3. Grant such declaratory and other relief as the Court deems just." App. to Pet. for Cert. 98a–99a.

1982. See App. to Pet. for Cert. 92a. On March 29, 1985, this second disallowance period was upheld by the Board. On June 5, 1985, the State filed a second complaint in District Court, seeking to overturn the second disallowance. *Id.*, at 89a.

On August 27, 1985, the District Court issued an opinion in the first disallowance case. It did not discuss the jurisdictional issue. On the merits, it held that the services in question were in fact rehabilitative, and that this classification was not barred by the fact that the Department of Education had played a role in their provision. *Massachusetts* v. *Heckler*, 616 F. Supp. 687 (Mass. 1985) (case below). Its judgment, dated October 7, 1985, simply "reversed" the Board's decision disallowing reimbursement of the sum of $6,414,964 in FFP under the Medicaid program. App. to Pet. for Cert. 32a. On November 25, 1985, in a second opinion relying on the analysis of the first, the court reversed the Board's second disallowance determination. *Massachusetts* v. *Heckler*, 622 F. Supp. 266 (Mass. 1985) (case below). It entered an appropriate judgment on December 2, 1985. App. to Pet. for Cert. 36a. That judgment did not purport to state what amount of money, if any, was owed by the United States to Massachusetts, nor did it order that any payment be made.

The Secretary at first had challenged the District Court's subject-matter jurisdiction,[11] but later filed a memorandum stating that as "a matter of policy, HHS has decided not to press the defense of lack of jurisdiction in this action." App. 20.[12] In his consolidated appeal to the First Circuit, the Sec-

---

[11] The Government's memorandum concerning subject-matter jurisdiction dated December 29, 1983, App. 19, see n. 12, *infra*, indicates that it had challenged the District Court's subject-matter jurisdiction in its answer filed October 28, 1983. That answer is not included in any of the papers filed with us, including the certified record.

[12] The memorandum had concluded, though, that two significant jurisdictional questions are presented by these cases: (1) Whether 42 U. S. C. § 1316 gives a district court jurisdiction to review a disallowance decision; and (2) whether a district court or the Claims Court has "jurisdiction over plain-

retary reexamined this policy decision and decided to argue that the District Court did not have jurisdiction.  The Court of Appeals accepted the Secretary's argument that the District Court could not order him to pay money to the State, but held that the District Court had jurisdiction to review the Board's disallowance decision and to grant declaratory and injunctive relief.  The court explained its understanding of the difference between relief that was wholly retrospective in nature and relief that affected the future relationship between the parties as follows:

> "The disallowance decision at issue in this case, unlike that at issue in [*Massachusetts* v. *Departmental Grant Appeals Bd. of Health and Human Services*, 815 F. 2d 778 (CA1 1987)], represents an ongoing policy that has significant prospective effect.  The structure of the Medicaid program (in which the Secretary 'reimburses' the states in advance) makes it inevitable that disallowance decisions concern money past due.  Yet the Secretary uses these decisions to implement important policies governing ongoing programs.  *Grant Appeals Board* concerned the unusual situation in which the disallowance decision had no significant prospective effect; the challenge *only* concerned the money allegedly past due.
>
> "Here, in contrast, the interpretation of the Medicaid Act announced in the disallowance decision affects far more than any money past due.  The special education exclusion defines the respective roles of the Commonwealth and HHS in a continuing program.
>
> .          .          .          .          .
>
> "Prospective relief is important to the Commonwealth both because the ICF/MR program is still active and because the legal issues involved have ramifications that affect other aspects of the Medicaid program.  What is at

---

tiff's claims, which can be construed as monetary claims over $10,000." App. 22.

stake here is the scope of the Medicaid program, not just how many dollars Massachusetts should have received in any particular year." 816 F. 2d, at 799 (emphasis in original).

On the merits, the Court of Appeals agreed with the District Court that the Secretary could not lawfully exclude the rehabilitative services provided to the mentally retarded just because the State had labeled them (in part) "educational" services and had used Department of Education personnel to help provide them. It therefore affirmed the District Court's holding that the decisions of the Grant Appeals Board must be reversed because the Secretary's "special education exclusion" violated the statute. It held, however, that it could not rule that the services in dispute were reimbursable because it had "no evidentiary basis for doing so." *Id.*, at 804. In sum, the Court of Appeals affirmed the District Court's declaratory judgment, vacated the "money judgment" against the Secretary, and remanded to the Secretary for further determinations regarding whether the services are reimbursable.[13]

In his petition for certiorari, the Secretary asked us to decide that the United States Claims Court had exclusive jurisdiction over the State's claim.[14] In its cross-petition, the

---

[13] The Court of Appeals explained:

"On remand the district court should send the case back to the Secretary for action consistent with the Medicaid Act as interpreted in this decision. Should the Secretary persist in withholding reimbursement for reasons inconsistent with our decision, the Commonwealth's remedy would be a suit for money past due under the Tucker Act in the Claims Court. In that subsequent suit we assume that the Secretary would be collaterally estopped from raising issues decided here." 816 F. 2d, at 800.

[14] The question presented in the Government's certiorari petition reads as follows:

"Whether the United States Claims Court has exclusive jurisdiction over a civil action against the United States that includes both a Tucker Act claim for more than $10,000 in money damages and a claim for declaratory or injunctive relief involving the same issues as the Tucker Act claim, or

State asked us to decide that the District Court had jurisdiction to grant complete relief.[15] We granted both petitions. 484 U. S. 1003 (1988). The basic jurisdictional dispute is over the meaning of the Administrative Procedure Act (APA), 5 U. S. C. §§ 702, 704.[16] The Secretary argues that § 702, as amended in 1976, does not authorize review because this is not an action "seeking relief other than money damages" within the meaning of the 1976 amendment to that section; he also argues that even if § 702 is satisfied, § 704 bars relief because the State has an adequate remedy in the Claims Court. The State must overcome both arguments in order to prevail; we shall discuss them separately.

## II

Since it is undisputed that the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of

---

whether such an action can be split into two lawsuits, with the district court and the regional court of appeals having jurisdiction over the claim for prospective relief, and the Claims Court having jurisdiction over the claim for retrospective relief." Pet. for Cert. (I).

[15] The question presented by the cross-petition reads as follows:

"Whether the United States District Court has jurisdiction under 28 U. S. C. § 1331, and 5 U. S. C. § 701 *et seq.*, to grant complete relief in an action which seeks judicial review of a final decision of the Secretary of Health and Human Services to deny coverage under the Medicaid Act of certain services rendered by a State to retarded citizens." Pet. for Cert. in No. 87–929, p. i.

[16] Certain jurisdictional arguments that have been advanced and rejected in similar cases are no longer pressed by either party. Thus, the State does not argue that a disallowance decision is the functional equivalent of a noncompliance decision that is specifically reviewable in the Court of Appeals pursuant to § 1316(a)(3). See *supra*, at 885, and n. 1. It acknowledges that there is no special statutory procedure covering disallowance decisions and relies entirely on the general provision for judicial review of agency action contained in the APA, 5 U. S. C. § 701 *et seq.* On the other hand, the Government no longer contends that § 701 forecloses judicial review of disallowance decisions because they are committed to the discretion of the Secretary. Further, it is common ground that if review is proper under the APA, the District Court had jurisdiction under 28 U. S. C. § 1331.

agency action by eliminating the defense of sovereign immunity in cases covered by the amendment, it is appropriate to begin by quoting the original text of § 702. Prior to 1976, it simply provided:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[17]

In 1975, in a case seeking review of a disallowance decision by the Secretary of the Department of Health, Education, and Welfare, the Court of Appeals for the Ninth Circuit concluded that the decision was reviewable in the District Court. *County of Alameda* v. *Weinberger*, 520 F. 2d 344. It would be difficult to question the fact that the disallowance decision was "agency action" that "adversely affected" the State, and that, accordingly, the State was "entitled to judicial review thereof."

The 1976 amendment contains no language suggesting that Congress disagreed with the Ninth Circuit decision. The amendment added the following sentence to the already broad coverage of § 702:

"An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."[18]

---

[17] See, *e. g.*, S. Rep. No. 94–996. pp. 19–20 (1976) (S. Rep.).

[18] The balance of § 702 provides:

"The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or

There are two reasons why the plain language of this amendment does not foreclose judicial review of the actions brought by the State challenging the Secretary's disallowance decisions.   First, insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages.   Second, and more importantly, even the monetary aspects of the relief that the State sought are not "money damages" as that term is used in the law.

Neither a disallowance decision, nor the reversal of a disallowance decision, is properly characterized as an award of "damages."   Either decision is an adjustment—and, indeed, usually a relatively minor one—in the size of the federal grant to the State that is payable in huge quarterly installments.   Congress has used the terms "overpayment" and "underpayment" to describe such adjustments in the open account between the parties,[19] and the specific agency action that reverses a disallowance decision is described as "restitution" in the statute.[20]

Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions."   Larson v. Domestic & Foreign Commerce Corp., 337 U. S. 682, 688 (1949) (emphasis added).   The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."   Thus, we have recognized that relief

---

deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

[19] See 42 U. S. C. § 1396b(d); n. 2, supra.

[20] See § 1316(c); supra, at 885.

that orders a town to reimburse parents for educational costs that Congress intended the town to pay is not "damages":

> "Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.
>
> "In this Court, the Town repeatedly characterizes reimbursement as 'damages,' but that simply is not the case. Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *School Committee of Burlington* v. *Department of Education of Massachusetts*, 471 U. S. 359, 370–371 (1985).

Judge Bork's explanation of the plain meaning of the critical language in this statute merits quotation in full. In his opinion for the Court of Appeals for the District of Columbia Circuit in *Maryland Dept. of Human Resources* v. *Department of Health and Human Services*, 246 U. S. App. D. C. 180, 763 F. 2d 1441 (1985),[21] he wrote:

> "We turn first to the question whether the relief Maryland seeks is equivalent to money damages. Maryland asked the district court for a declaratory judgment and for injunctive relief 'enjoin[ing] defendants from reducing funds otherwise due to plaintiffs, or imposing any sanctions on such funds for alleged Title XX violations.' . . . We are satisfied that the relief Maryland seeks here is not a claim for money damages, although it is a claim that would require the payment of money by the federal government.

---

[21] The District of Columbia Circuit has recently reaffirmed *Maryland Dept. of Human Resources* in *National Assn. of Counties* v. *Baker*, 268 U. S. App. D. C. 373, 842 F. 2d 369 (1988).

"We begin with the ordinary meaning of the words Congress employed. The term 'money damages,' 5 U. S. C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' D. Dobbs, *Handbook on the Law of Remedies* 135 (1973). Thus, while in many instances an award of money is an award of damages, '[o]ccasionally a money award is also a specie remedy.' *Id.* Courts frequently describe equitable actions for monetary relief under a contract in exactly those terms. *See, e.. g., First National State Bank* v. *Commonwealth Federal Savings & Loan Association,* 610 F. 2d 164, 171 (3d Cir. 1979) (specific performance of contract to borrow money); *Crouch* v. *Crouch,* 566 F. 2d 486, 488 (5th Cir. 1978) (contrasting lump-sum damages for breach of promise to pay monthly support payments with an order decreeing specific performance as to future installments); *Joyce* v. *Davis,* 539 F. 2d 1262, 1265 (10th Cir. 1976) (specific performance of a promise to pay money bonus under a royalty contract).

"In the present case, Maryland is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds. If the program in this case involved in-kind benefits this would be altogether evident. The fact that in the present case it is money rather than in-kind benefits that pass from the federal government to the states (and then, in the form of services, to program beneficiaries) cannot transform the nature of the relief sought — specific relief, not relief in the form of damages. *Cf. Clark* v. *Library of Congress,* 750 F. 2d 89, 104 n. 33 (D.C. Cir. 1984) (dictum) (describing

an action to compel an official to repay money improperly recouped as 'in essence, specific relief')." *Id.*, at 185, 763 F. 2d, at 1446 (emphasis in original) (citation omitted).

In arguing for a narrow construction of the 1976 amendment—which was unquestionably intended to broaden the coverage of § 702—the Secretary asks us to substitute the words "monetary relief" for the words "money damages" actually selected by Congress. Given the obvious difference in meaning between the two terms and the well-settled presumption that Congress understands the state of existing law when it legislates, see, *e. g.*, *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979), only the most compelling reasons could justify a revision of a statutory text that is this unambiguous. Nevertheless, we have considered the Secretary's argument that the legislative history of § 702 supports his reading of the amendment.

The 1976 amendment to § 702 was an important part of a major piece of legislation designed to remove "technical" obstacles to access to the federal courts.[22] The statute was the culmination of an effort generated by scholarly writing and bar association work in the early 1960's.[23] Although the Department of Justice initially opposed the proposal, it eventually reversed course and offered its support.[24] We shall com-

---

[22] See H. R. Rep. No. 94–1656, pp. 3, 23 (1976) (H. R. Rep.); S. Rep., at 2, 22 (same).

[23] See, *e. g.*, Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv. L. Rev. 1479 (1962); Cramton, Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich. L. Rev. 387 (1970).

[24] See, *e. g.*, Sovereign Immunity: Hearing on S. 3568 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 91st Cong., 2d Sess., 255–257 (1970) (hereafter 1970 Hearing) (letter of William D. Ruckleshaus, Assistant Attorney General, to Sen. Kennedy, dated July 8, 1970) ("The record is not established

ment first on the legislative materials that relate directly to the bill that passed in 1976, and then refer to the 1970 Hearing on which the Government places its principal reliance.

Two propositions are perfectly clear. The first concerns the text of the amendment. There is no evidence that any legislator in 1976 understood the words "money damages" to have any meaning other than the ordinary understanding of the term as used in the common law for centuries. No one suggested that the term was the functional equivalent of a broader concept such as "monetary relief" and no one proposed that the broader term be substituted for the familiar one.[25] Each of the Committee Reports repeatedly used the term "money damages";[26] the phrase "monetary relief" was used in each Report once, and only in intentional juxtaposition and distinction to "specific relief," indicating that the drafters had in mind the time-honored distinction between damages and specific relief.[27] There is no support in that his-

_____

that the defense of sovereign immunity is all bad"); H. R. Rep., at 2, 4, 6, 25–30 (letter of Assistant Attorney General Scalia stating that although the Department had opposed the amendment, it had reconsidered its position and decided to endorse the amendment); S. Rep., at 3, 5, 24–29 (same).

[25] The Department of Justice proposed other technical changes but did not object to the use of the term "money damages." See H. R. Rep., at 27–28; S. Rep., at 26–27 (same).

[26] See H. R. Rep., at 4, 7, 11, 20, 25; S. Rep., at 4, 6, 10, 19, 25 (same).

[27] See H. R. Rep., at 11 ("The first of the additional sentences provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.))"; S. Rep., at 10 (same). The First Circuit has construed this passage as using "the terms 'money damages' and 'monetary relief' interchangeably and oppos[ing] money in general to 'specific relief.'" *Massachusetts* v. *Departmental Grant Appeals Bd. of Health and Human Services*, 815 F. 2d 778, 782 (1987). That the passage uses "money damages" and "monetary relief" interchangeably, however, does not answer the question whether Congress intended the former or the latter to be the excluded category of relief under the APA. Reading the passage as "oppos[ing] money in general to 'specific relief'"

tory for a departure from the plain meaning of the text that Congress enacted.

Second, both the House and Senate Committee Reports indicate that Congress understood that § 702, as amended, would authorize judicial review of the "administration of Federal grant-in-aid programs."[28] The fact that grant-in-aid programs were expressly included in the list of proceedings in which the Committees wanted to be sure the sovereign-immunity defense was waived is surely strong affirmative evidence that the members did not regard judicial review of an agency's disallowance decision as an action for damages.

If we turn to the 1970 Hearing and the earlier scholarly writings, we find that the terms "monetary relief" and "money damages" were sometimes used interchangeably. That fact is of only minimal significance, however, for several reasons. First, given the high caliber of the scholars who testified, it seems obvious that if they had intended the exclusion for proceedings seeking "money damages" to encompass all proceedings seeking any form of monetary relief, they would have drafted their proposal differently. Second, they cited cases involving challenges to federal grant-in-aid programs as examples of the Government's reliance on a sovereign-immunity defense that should be covered by the proposed legislation.[29] Third, the case that they discussed at

---

assumes that specific relief may not include an order for the payment of money, a proposition that has never been the law. See *supra*, at 893–896. Thus, the better reading of the above passage is that "monetary relief" was meant as a synonym for "money damages." See also H. R. Rep., at 4–5, 7, 19–20 (contrasting money damages with specific, or equitable, relief); S. Rep., at 4, 6, 19 (same).

[28] H. R. Rep., at 9; S. Rep., at 8 (same).

[29] See, *e. g.*, 1970 Hearing, at 121 (Cramton, Committee on Judicial Review: Memorandum in support of the recommendation relating to statutory reform of the sovereign immunity doctrine) (citing *Lee County School Dist. No. 1* v. *Gardner*, 263 F. Supp. 26 (SC 1967) and *Dermott Special School Dist.* v. *Gardner*, 278 F. Supp. 687 (ED Ark. 1968), and specifically de-

the greatest length in the 1970 Hearing was *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949).[30] Although they criticized the reliance on sovereign immunity in that opinion, they made no objection to its recognition of the classic distinction between the recovery of money damages and "the recovery of specific property or monies." *Id.*, at 688.

Judge Bork's summary of the legislative history is especially convincing:

"Neither the House nor Senate Reports (there was no Conference Report) intimates that Congress intended the term 'money damages' as a shorthand for 'whatever forms of monetary relief would be available under the Tucker Act.' To the contrary, the federal sovereign immunity case law, which the Reports discuss at length, *see* H. R. Rep. No. 1656, *supra*, at 5–8; S. Rep. No. 996, 94th Cong., 2d Sess. 4–8 (1976), suggests that Congress would have understood the recovery of specific monies to be specific relief in this context. *See, e. g., Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, 688 (1949) (contrasting 'damages' and 'specific relief' and including in the latter category 'the recovery of specific property or monies').

"Moreover, while reiterating that Congress intended 'suits for damages' to be barred, both Reports go on to say that 'the time [has] now come to eliminate the sovereign immunity defense in *all equitable actions for specific relief* against a Federal agency or officer acting in an official capacity.' H. R. Rep. No. 1656, *supra*, at 9; S. Rep. No. 996, *supra*, at 8, U. S. Code Cong. & Admin. News 1976, p. 6129 (emphasis added). That sweeping declaration strongly suggests that Congress intended to authorize equitable suits for specific mone-

---

scribing the former case as "challenge of HEW deferral of payment of federal funds to school district").

[30] See, *e. g.*, 1970 Hearing, at 102–109, 111–115, 120, 125–126, 132–133.

tary relief as we have defined that category. This inference is made virtually conclusive by the fact that both Reports then enumerate several kinds of cases in which the sovereign immunity defense had continued to pose an undesirable bar to consideration of the merits: that listing includes cases involving 'administration of Federal grant-in-aid programs.' H. R. Rep. No. 1656, *supra*, at 9; S. Rep. No. 996, *supra*, at 8, U. S. Code Cong. & Admin. News 1976, p. 6129. Specific relief in cases involving such programs will, of course, often result in the payment of money from the federal treasury. It seems to us, then, that the legislative history supports the proposition that Congress used the term 'money damages' in its ordinary signification of compensatory relief. We therefore hold that Maryland's claims for specific relief, albeit monetary, are for 'relief other than money damages' and therefore within the waiver of sovereign immunity in section 702." 246 U. S. App. D. C., at 186–187, 763 F. 2d, at 1447–1448.

Thus, the combined effect of the 1970 Hearing and the 1976 legislative materials is to demonstrate conclusively that the exception for an action seeking "money damages" should not be broadened beyond the meaning of its plain language. The State's suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.[31] The fact that the

---

[31] There are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay. See n. 42, *infra*. The jurisdiction of the Claims Court, however, is not expressly limited to actions for "money damages," see n. 48, *infra*, whereas that term does define the limits of the exception to § 702. More-

mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief. Judge Bork's explanation bears repeating:

> "[The State] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [the State] will suffer or has suffered by virtue of the withholding of those funds. If the program in this case involved in-kind benefits this would be altogether evident. The fact that in the present case it is money rather than in-kind benefits that pass from the federal government to the states (and then, in the form of services, to program beneficiaries) cannot transform the nature of the relief sought — specific relief, not relief in the form of damages." 246 U. S. App. D. C., at 185, 763 F. 2d, at 1446.

### III

The Secretary's novel submission that the entire action is barred by § 704 must be rejected because the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court. A brief review of the principal purpose of § 704 buttresses this conclusion.

Section 704 was enacted in 1946 as § 10(c) of the APA. In pertinent part, it provided:

---

over, such statutes, unlike a complex scheme such as the Medicaid Act that governs a set of intricate, ongoing relationships between the States and the Federal Government, are all statutes that provide compensation for specific instances of past injuries or labors; suits brought under these statutes do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act. Thus, to the extent that suits to enforce these statutes can be considered suits for specific relief, but see n. 42, *infra*, suits under the Tucker Act in the Claims Court offer precisely the sort of "special and adequate review procedures" that § 704 requires to direct litigation away from the district courts. See *infra*, at 903–905, and n. 39.

> "Every agency action made reviewable by statute and
> every final agency action for which there is no other ade-
> quate remedy in any court shall be subject to judicial re-
> view."   60 Stat. 243.[32]

Earlier drafts of what became § 704 provided that "only
final actions, rules, or orders, *or* those for which there is no
other adequate judicial remedy . . . shall be subject to such
review," or that "[e]very final agency action, *or* agency action
for which there is no other adequate remedy in any court,
shall be subject to judicial review."[33]   Professor Davis, a
widely respected administrative law scholar, has written that
§ 704 "has been almost completely ignored in judicial opin-
ions,"[34] and has discussed § 704's bar to judicial review of
agency action when there is an "adequate remedy" elsewhere
as merely a restatement of the proposition that "[o]ne need
not exhaust administrative remedies that are inadequate."[35]

---

[32] The provision now reads "[a]gency action made reviewable by statute
and final agency action for which there is no other adequate remedy in a
court are subject to judicial review."   5 U. S. C. § 704.

[33] See Administrative Procedure Act: Legislative History, S. Doc. No.
248, pp. 145, 154, 160, 176, 179, 335 (Comm. Print 1946) (hereafter APA
Leg. Hist.) (emphases added).   The Senate Judiciary Committee Print of
June 1945 contained the language that eventually was adopted along with
an explanatory column that read "Subsection (c), defining reviewable acts,
is designed also to negative any intention to make reviewable merely pre-
liminary or procedural orders where there is a subsequent and adequate
remedy at law available, as is presently the rule."   APA Leg. Hist. 37.
At least one Court of Appeals has construed § 704 as addressing only
finality concerns.   *Massachusetts* v. *Departmental Grant Appeals Bd. of
Health and Human Services,* 815 F. 2d, at 784 ("The legislative history
of § 704 shows that Congress intended thereby to codify the existing law
concerning ripeness and exhaustion of remedies").

[34] K. Davis, Administrative Law § 26:12, p. 468 (2d ed. 1983).

[35] *Id.,* at § 26:11, p. 464.   Further, § 704 is titled "Actions reviewable"
and it discusses, in the two sentences that follow the one at issue today,
matters regarding finality.   Thus, it is certainly arguable that by enacting
§ 704 Congress merely meant to ensure that judicial review would be lim-
ited to final agency actions and to those nonfinal agency actions for which
there would be no adequate remedy later.

However, although the primary thrust of § 704 was to codify the exhaustion requirement, the provision as enacted also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action. As Attorney General Clark put it the following year, § 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures."[36] At the time the APA was enacted, a number of statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action; for example, Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals,[37] and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts.[38] When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies.

The exception that was intended to avoid such duplication should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action.

---

[36] Attorney General's Manual on the Administrative Procedure Act 101 (1947). It should be noted that Attorney General Clark's statement would also fit the interpretation that § 704 was intended only to codify traditional rules of finality, for the "special and adequate review procedures" to which he referred could well have been the various administrative-level procedures that litigants have traditionally been required to exhaust before coming into court.

[37] See 15 U. S. C. § 45(c) (1940 ed.); 29 U. S. C. § 160(f) (1946 ed.). These provisions remain in today's Code. See 15 U. S. C. § 45(c); 29 U. S. C. § 160(f).

[38] See 38 Stat. 219 (1913). This provision has since been repealed. See 49 U. S. C. App. § 17 (1988 ed.). Cases decided by this Court reviewing decisions of such three-judge panels include *Pennsylvania R. Co.* v. *United States*, 323 U. S. 588 (1945), and *Chesapeake & Ohio R. Co.* v. *United States*, 283 U. S. 35 (1931).

In our leading opinion explaining the significance of this provision, Justice Harlan wrote:

> "The Administrative Procedure Act provides specifically not only for review of '[a]gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court,' 5 U. S. C. § 704. The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140–141 (1967) (footnote omitted).

A restrictive interpretation of § 704 would unquestionably, in the words of Justice Black, "run counter to § 10 and § 12 of the Administrative Procedure Act. Their purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes . . . ." *Shaughnessy* v. *Pedreiro*, 349 U. S. 48, 51 (1955).

The Secretary argues that § 704 should be construed to bar review of the agency action in the District Court because monetary relief against the United States is available in the Claims Court under the Tucker Act. This restrictive—and unprecedented—interpretation of § 704 should be rejected because the remedy available to the State in the Claims Court is plainly not the kind of "special and adequate review procedure" that will oust a district court of its normal jurisdiction under the APA.[39] Moreover, the availability of

---

[39] As noted above, see n. 31, *supra*, litigation in the Claims Court can offer precisely the kind of "special and adequate review procedures" that are needed to remedy particular categories of past injuries or labors for which various federal statutes provide compensation. See n. 42, *infra*. Managing the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets re-

any review of a disallowance decision in the Claims Court is doubtful.

The Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, we have stated categorically that "the Court of Claims has no power to grant equitable relief." [40] As the facts of these cases illustrate, the interaction between the State's administration of its responsibilities under an approved Medicaid plan and the Secretary's interpretation of his regulations may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices. We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties. [41]

Moreover, in some cases the jurisdiction of the Claims Court to entertain the action, or perhaps even to enter a specific money judgment against the United States, would be at least doubtful. [42] Regarding the former dilemma: If a State

quires a different sort of review and relief process. The APA is tailored to fit the latter situation; the Tucker Act, the former.

[40] *Richardson* v. *Morris*, 409 U. S. 464, 465 (1973) *(per curiam);* see also, *e. g., Glidden Co.* v. *Zdanok*, 370 U. S. 530, 557 (1962) (opinion of Harlan, J.) ("From the beginning [the Court of Claims] has been given jurisdiction only to award damages, not specific relief"). Although Congress has subsequently given the Claims Court certain equitable powers in specific kinds of litigation, see 28 U. S. C. §§ 1491(a)(2)–(3), the statements from *Richardson* and *Glidden* are still applicable to actions involving review of an agency's administration of a grant-in-aid program.

[41] See, *e. g., Massachusetts* v. *Departmental Grant Appeals Bd. of Health and Human Services*, 815 F. 2d, at 789 (suit for unique reimbursement of court-ordered abortions outside the APA's waiver of sovereign immunity only because the requested relief "is unlikely to have any significant prospective effect upon the ongoing grant-in-aid relationship between the Commonwealth and the United States") (Coffin, J., concurring).

[42] As a threshold matter, it is not altogether clear that the Claims Court would have jurisdiction under the Tucker Act, 28 U. S. C. § 1491(a)(1), to

elects to retain the amount covered by a disallowance until completion of review by the Grant Appeals Board, see 42 U. S. C. § 1396b(d)(5); n. 3, *supra*, it will not be able to file suit in the Claims Court until after the disallowance is recouped from a future quarterly payment. It is no answer to suggest that a State will not be harmed as long as it retains the money, because its interest in planning future programs

review a disallowance claim. To determine whether one may bring, pursuant to Tucker Act jurisdiction, a "claim against the United States founded . . . upon . . . any Act of Congress," *ibid.*, "one must always ask . . . whether the . . . legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S. S. Corp.* v. *United States,* 372 F. 2d 1002, 1009 (1967) (cited with approval in *United States* v. *Testan,* 424 U. S. 392, 398, 400 (1976)). Statutes that have been "interpreted as mandating compensation by the Federal Government for the damage sustained," 372 F. 2d, at 1009, generally are provisions such as the Back Pay Act, 5 U. S. C. § 5596(b), see *United States* v. *Testan,* 424 U. S., at 405, and 37 U. S. C. § 242 (1958 ed.) (repealed, see 76 Stat. 498 (1962)), which provided compensation to prisoners of war, see *Bell* v. *United States,* 366 U. S. 393, 398 (1961). These laws attempt to compensate a particular class of persons for past injuries or labors. In contrast, the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures. See *supra,* at 900–901; see also *United States* v. *Mottaz,* 476 U. S. 834, 850–851 (1986) (suit to force Government to buy property interests not viewed as "representing damages for the Government's past acts, the essence of a Tucker Act claim for monetary relief").

Moreover, Congress has not created an express cause of action providing for the review of disallowance decisions in the Claims Court. To construe statutes such as the Back Pay Act and the old 37 U. S. C. § 242, *supra* this page, as "mandating compensation by the Federal Government for the damage sustained," 372 F. 2d, at 1009, one must imply from the language of such statutes a cause of action. The touchstone here, of course, is whether Congress intended a cause of action that it did not expressly provide. See, *e. g., Thompson* v. *Thompson,* 484 U. S. 174 (1988); *Cort* v. *Ash,* 422 U. S. 66 (1975). It seems likely that while Congress intended "shall pay" language in statutes such as the Back Pay Act to be self-enforcing—*i. e.,* to create both a right and a remedy—it intended similar language in § 1396b(a) of the Medicaid Act to provide merely a right, knowing that the APA provided for review of this sort of agency action.

for groups such as the mentally retarded who must be trained in ICF"s may be more pressing than the monetary amount in dispute. Such planning may make it important to seek judicial review—perhaps in the form of a motion for a preliminary injunction—as promptly as possible after the agency action becomes final. A district court has jurisdiction both to grant such relief and to do so while the funds are still on the State's side of the ledger (assuming administrative remedies have been exhausted); the Claims Court can neither grant equitable relief, *supra*, at 905, nor act in any fashion so long as the Federal Government has not yet offset the disallowed amount from a future payment. See § 1396b(d)(5); n. 3, *supra*.[43] Regarding the latter problem: Given the fact that the quarterly payments of federal money are actually advances against expenses that have not yet been incurred by the State, it is arguable that a dispute concerning the status of the open account is not one in which the State can claim an entitlement to a specific sum of money that the Federal Government owes to it.[44]

Further, the nature of the controversies that give rise to disallowance decisions typically involve state governmental

---

[43] It is important to remember that whether injunctive or declaratory relief is appropriate in a given case will not always be apparent at the outset. Since, as a *category of case*, alleged "improper Medicaid disallowances" cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court. Then, the district court judge can award proper relief.

[44] "The statute requires that the Secretary of HHS recover disallowed Medicaid payments by offsetting such payments against future quarterly advances. 42 U. S. C. § 1396b(d)(2). It cannot be determined from the record whether this procedure has been followed in the instant case. Judge Blumenfeld assumed that once his decision was filed, HHS would 'promptly restore any setoff already taken.' *Connecticut* v. *Schweiker*, 557 F. Supp. [1077,] 1091 [(Conn. 1983)]. Again, the record is silent on whether HHS had done so. However, the parties have not requested judicial resolution of the matter." *Connecticut Dept. of Income Maintenance* v. *Heckler*, 731 F. 2d 1052, 1055, n. 3 (CA2 1984), aff'd, 471 U. S. 524 (1985).

activities that a district court would be in a better position to understand and evaluate than a single tribunal headquartered in Washington. We have a settled and firm policy of deferring to regional courts of appeals in matters that involve the construction of state law.[45] That policy applies with special force in this context because neither the Claims Court nor the Court of Appeals for the Federal Circuit has any special expertise in considering the state-law aspects of the controversies that give rise to disallowances under grant-in-aid programs. It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of federal-state interaction to be reviewed in a specialized forum such as the Court of Claims. More specifically, it is anomalous to assume that Congress would channel the review of compliance decisions to the regional courts of appeals, see 42 U. S. C. § 1316(a)(3); *supra*, at 885, and yet intend that the same type of questions arising in the disallowance context should be resolved by the Claims Court or the Federal Circuit.[46]

---

[45] See, *e. g.*, *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 499–500 (1985); *Bishop* v. *Wood*, 426 U. S. 341, 345–346 (1976); *Cort* v. *Ash*, 422 U. S. 66, 73, n. 6 (1975).

[46] See *Delaware Div. of Health and Social Services* v. *Department of Health and Human Services*, 665 F. Supp. 1104, 1117, n. 15 (Del. 1987) (pointing out this anomaly). It should be remembered that in the Federal Courts Improvement Act of 1982, Congress established the United States Claims Court to replace the old Court of Claims, pursuant to its Article I powers. See 28 U. S. C. § 171(a). Claims Court judges, unlike the life-tenured Article III judges who sit in district courts, serve for limited terms of 15 years. See 28 U. S. C. § 172(a). Although it is true that the Federal Circuit is an Article III court, it seems highly unlikely that Congress intended to designate an Article I court as the primary forum for judicial review of agency action that may involve questions of policy that can arise in cases such as these.

In rejecting the Government's plea for Claims Court jurisdiction in a similar case, Judge Wright of the Delaware District Court explained "the importance of District Court review of agency action":

"[T]he policies of the APA take precedence over the purposes of the Tucker Act. In the conflict between two statutes, established principles of statu-

## IV ·

We agree with the position advanced by the State in its cross-petition—that the judgments of the District Court should have been affirmed in their entirety—for two independent reasons. First, neither of the District Court's orders in these cases was a "money judgment," as the Court of Appeals held. The first order (followed in the second, see Part I, *supra*) simply "reversed" the "decision of the Department Grant Appeals Board of the United States Department of Health and Human Services in Decision No. 438 (May 31, 1983)." [47] It is true that it describes Decision No. 438 as one that had disallowed reimbursement of $6,414,964 to the State, but it did not order that amount to be paid, and it did not purport to be based on a finding that the Federal Gov-

---

tory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act. The Court of Claims is a court of limited jurisdiction, because its jurisdiction is statutorily granted and it is to be strictly construed.

.   .   .   .   .

"Much recent academic writing emphasizes the importance of District Court review of agency action. The theoretical justification for judicial review of agency action is grounded in concerns about constraining the exercise of discretionary power by administrative agencies. That power is legitimized by the technical expertise of agencies. But judicial review promotes fidelity to statutory requirements, and, when congresional intent is ambiguous, it increases the likelihood that the regulatory process will be a responsible exercise of discretion.

.   .   .   .   .

"The policies of the APA take precedence over the Tucker Act and plaintiff's action should properly be treated as a final agency action reviewable in District Court." 665 F. Supp., at 1117–1118 (citations omitted).

[47] The full text of the District Court's judgment reads as follows:

"For the reasons set forth in this Court's August 27, 1985 Memorandum and Order, it is hereby ordered and adjudged that the decision of the Department Grant Appeals Board of the United States Department of Health and Human Services in Decision No. 438 (May 31, 1983) which disallowed reimbursement to the Commonwealth of Massachusetts the sum of $6,414,964 in federal financial participation under the Medicaid program, 42 U. S. C. §§ 1396 *et seq.*, is reversed.

"Dated this 7th day of October, 1985." App. to Pet. for Cert. 32a.

ernment owed Massachusetts that amount, or indeed, any amount of money. Granted, the judgment tells the United States that it may not disallow the reimbursement on the grounds given, and thus it is likely that the Government will abide by this declaration and reimburse Massachusetts the requested sum. But to the extent that the District Court's judgment engenders this result, this outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law.

Second, even if the District Court's orders are construed in part as orders for the payment of money by the Federal Government to the State, such payments are not "money damages," see Part II, *supra*, and the orders are not excepted from § 702's grant of power by § 704, see Part III, *supra*. That is, since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity. See Part II, *supra*. The District Court's jurisdiction to award complete relief in these cases is not barred by the possibility that a purely monetary judgment may be entered in the Claims Court. See Part III, *supra*.[48]

---

[48] It is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000. (Title 28 U. S. C. § 1346(a)(2) expressly authorizes concurrent jurisdiction in the district courts and the Claims Court for claims under $10,000.) That assumption is not based on any language in the Tucker Act granting such exclusive jurisdiction to the Claims Court. Rather, that court's jurisdiction is "exclusive" only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court. If, however, § 702 of the APA is construed to authorize a district court to grant monetary relief—other than traditional "money damages"—as an incident to the complete relief that is appropriate in the review of agency action, the fact that the purely monetary aspects of the case could have been decided in the Claims

The question whether the District Court had the power to enter the orders it did is governed by the plain language of 5 U. S. C. § 706.[49]   It seems perfectly clear that, as "the reviewing court," the District Court had the authority to "hold unlawful and set aside agency action" that it found to be "not in accordance with law."   As long as it had jurisdiction under § 702 to review the disallowance orders of the Secretary, it also had the authority to grant the complete relief authorized by § 706. Neither the APA nor any of our decisions required the Court of Appeals to split either of these cases into two parts.[50]

---

Court is not a sufficient reason to bar that aspect of the relief available in a district court.

[49] Section 706 provides:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.   The reviewing court shall—

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law;

"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

[50] See, e. g., Delaware Div. of Health and Social Services v. Department of Health and Human Services, 665 F. Supp., at 1117 ("[B]ifurcated proceedings . . . would add another layer of complexity to an arena already straining under excess jurisdictional baggage and procedural weightiness").

In his explanation to Congress of the basic purpose of what became the 1976 amendment to the APA, Dean Cramton endorsed the view that "'today the doctrine [of sovereign immunity] may be satisfactory to technicians but not at all to persons whose main concern is with justice. . . . The trouble with the sovereign immunity doctrine is that it interferes with consideration of practical matters, and transforms everything into a play on words.'"[51] In our judgment a fair consideration of "practical matters" supports the conclusion that the district courts and the regional courts of appeals have jurisdiction to review agency action of the kind involved in these cases and to grant the complete relief authorized by § 706. Accordingly, the Court of Appeals should have affirmed the judgments of the District Court in their entirety.

Thus, we affirm in part, reverse in part, and remand to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

The Court construes the District Court's orders as not having entered a judgment for money damages within the meaning of 5 U. S. C. § 702. I am prepared to accept that view of what the District Court did, although the Court of Appeals had a different view.

The Court's opinion, as I understand it, also concludes that the District Court, in the circumstances present here, would have had jurisdiction to entertain and expressly grant a prayer for a money judgment against the United States. I am unprepared to agree with this aspect of the opinion and hence concur only in the result the Court reaches with respect to the construction of § 702.

---

[51] 1970 Hearing, at 115 (quoting Carrow, Sovereign Immunity in Administrative Law—A New Diagnosis, 9 J. Pub. L. 1, 22 (1960) (in turn quoting letter written by Professor Walter Gellhorn)).

The Court is correct in holding that § 704 does not bar District Court review of the challenged orders, the reason being that the Claims Court could not entertain and grant the claims presented to and granted by the District Court. I thus agree with the result reached in Part III of the Court's opinion.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

The Court holds for the State because it finds that these suits do not seek money damages, and involve claims for which there is no "adequate remedy" in the Claims Court. I disagree with both propositions, and therefore respectfully dissent.

## I

"The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress." *Block* v. *North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U. S. 273, 280 (1983). For this waiver, the Commonwealth of Massachusetts (hereafter respondent) relies on a provision added to § 10 of the Administrative Procedure Act (APA) in 1976:

> "An action in a court of the United States *seeking relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U. S. C. § 702 (emphasis added).

The Government contends that respondent's lawsuits seek "money damages" and therefore § 702 is unavailing.

In legal parlance, the term "damages" refers to money awarded as reparation for injury resulting from breach of legal duty. Webster's Third New International Dictionary

571 (1981); Black's Law Dictionary 351–352 (5th ed. 1979); D. Dobbs, Law of Remedies § 3.1, p. 135 (1973); W. Hale, Law of Damages 1 (Cooley 2d ed. 1912). Thus the phrase "money damages" is something of a redundancy, but it is, nonetheless, a common usage and refers to one of the two broad categories of judicial relief in the common-law system. The other, of course, is denominated "specific relief." Whereas damages compensate the plaintiff for a loss, specific relief prevents or undoes the loss—for example, by ordering return to the plaintiff of the precise property that has been wrongfully taken, or by enjoining acts that would damage the plaintiff's person or property. See 5A A. Corbin, Contracts § 1141, p. 113 (1964); Dobbs, *supra*, at 135.

The use of the term "damages" (or "money damages") in a context dealing with legal remedies would naturally be thought to advert to this classic distinction. This interpretation is reinforced by the desirability of reading § 702 *in pari materia* with the Tucker Act, 28 U. S. C. § 1491, which grants the Claims Court jurisdiction over certain suits against the Government. Although the Tucker Act is not expressly limited to claims for money damages, it "has long been construed as authorizing only actions for money judgments and not suits for equitable relief against the United States. See *United States* v. *Jones*, 131 U. S. 1 (1889). The reason for the distinction flows from the fact that the Court of Claims has no power to grant equitable relief . . . ." *Richardson* v. *Morris*, 409 U. S. 464, 465 (1973) *(per curiam);* see *Lee* v. *Thornton*, 420 U. S. 139, 140 (1975) *(per curiam)* (Tucker Act jurisdiction empowers courts "to award damages but not to grant injunctive or declaratory relief"); *United States* v. *King*, 395 U. S. 1, 3 (1969) (relief the Claims Court can give is "limited to actual, presently due money damages from the United States"); *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 557 (1962) (Harlan, J., announcing the judgment of the Court) ("From the beginning [the Court of Claims] has been given jurisdiction only to award dam-

ages, not specific relief"). Since under the Tucker Act the *absence* of Claims Court jurisdiction generally turns upon the distinction between money damages and specific relief,[1] it is sensible, if possible (and here it is not only possible but most natural), to interpret § 702 so that the *presence* of district court jurisdiction will turn upon the same distinction. Otherwise, there would be a gap in the scheme of relief—an utterly irrational gap, which we have no reason to believe was intended.

The Court agrees that "the words 'money damages' [were not intended to] have any meaning other than the ordinary understanding of the term as used in the common law for centuries," *ante*, at 897, and that § 702 encompasses "the time-honored distinction between damages and specific relief," *ibid.* It concludes, however, that respondent's suits seek the latter and not the former. The first theory the Court puts forward to support this conclusion is that, "insofar as [respondent's] complaints sought declaratory and injunctive relief, they were certainly not actions for money damages," *ante*, at 893, and since the District Court simply reversed the decision of the Departmental Grant Appeals Board, "neither of [its] orders in this case was a 'money judgment,'" *ante*, at 909. I cannot agree (nor do I think the Court really agrees) with this reasoning. If the jurisdictional division established by Congress is not to be reduced to an absurdity, the line between damages and specific relief must surely be drawn on the basis of the substance of the claim, and not its mere form. It does not take much lawyerly inventiveness to convert a

---

[1] In 1972 the Tucker Act was amended to give the Claims Court jurisdiction to issue "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records," and "[i]n any case within its jurisdiction, . . . to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U. S. C. § 1491(a)(2). In 1982 the Tucker Act was again amended to give the Claims Court exclusive jurisdiction to grant declaratory and equitable relief "on any contract claim brought before the contract is awarded." 28 U. S. C. § 1491(a)(3).

claim for payment of a past due sum (damages) into a prayer for an injunction against refusing to pay the sum, or for a declaration that the sum must be paid, or for an order reversing the agency's decision not to pay. It is not surprising, therefore, that "in the 'murky' area of Tücker Act jurisprudence . . . one of the few clearly established principles is that the substance of the pleadings must prevail over their form," *Amoco Production Co.* v. *Hodel,* 815 F. 2d 352, 361 (CA5 1987), cert. pending, No. 87–372. All the Courts of Appeals that to my knowledge have addressed the issue, 12 out of 13, are unanimous that district court jurisdiction is not established merely because a suit fails to pray for a money judgment. See, *e. g., Massachusetts* v. *Departmental Grant Appeals Bd. of Health and Human Services,* 815 F. 2d 778, 783 (CA1 1987); *B. K. Instrument, Inc.* v. *United States,* 715 F. 2d 713, 727 (CA2 1983); *Hahn* v. *United States,* 757 F. 2d 581, 589 (CA3 1985); *Portsmouth Redevelopment & Housing Authority* v. *Pierce,* 706 F. 2d 471, 474 (CA4), cert. denied, 464 U. S. 960 (1983); *Alabama Rural Fire Ins. Co.* v. *Naylor,* 530 F. 2d 1221, 1228–1230 (CA5 1976); *Tennessee ex rel. Leech* v. *Dole,* 749 F. 2d 331, 336 (CA6 1984), cert. denied, 472 U. S. 1018 (1985); *Clark* v. *United States,* 596 F. 2d 252, 253–254 (CA7 1979) *(per curiam); Minnesota ex rel. Noot* v. *Heckler,* 718 F. 2d 852, 859, n. 12 (CA8 1983); *Rowe* v. *United States,* 633 F. 2d 799, 802 (CA9 1980); *United States* v. *Kansas City,* 761 F. 2d 605, 608–609 (CA10 1985); *Megapulse, Inc.* v. *Lewis,* 217 U. S. App. D. C. 397, 405, 672 F. 2d 959, 967 (1982); *Chula Vista City School Dist.* v. *Bennett,* 824 F. 2d 1573, 1579 (CA Fed. 1987). The Court cannot intend to stand by a theory that obliterates § 702's jurisdictional requirements, that permits every Claims Court suit to be brought in district court merely because the complaint prays for injunctive relief, and that is contrary to the law of all 12 Circuits that have addressed the issue. Therefore, although the Court describes this first theory as an "in-

dependent reaso[n]" for its conclusion, *ante*, at 909, I must believe that its decision actually rests on different grounds.

The Court's second theory is that "the monetary aspects of the relief that the State sought are not 'money damages' as that term is used in the law," *ante*, at 893; see *ante*, at 910. This at least focuses on the right question: whether the claim is in substance one for money damages. But the reason the Court gives for answering the question negatively, that respondent's suits are not "seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated," *ante*, at 900, is simply wrong. Respondent sought money to compensate for the monetary loss (damage) it sustained by expending resources to provide services to the mentally retarded in reliance on the Government's statutory duty to reimburse, just as a Government contractor's suit seeks compensation for the loss the contractor sustains by expending resources to provide services to the Government in reliance on the Government's contractual duty to pay. Respondent's lawsuits thus precisely fit the classic definition of suits for money damages.[2] It is true, of course, that they also fit a general description of a suit for spe-

---

[2] The Court points out that "the specific agency action that reverses a disallowance decision is described as 'restitution' in the statute [42 U. S. C. § 1316(c)]." *Ante*, at 893. I doubt that the term in the statute is a term of art, or has anything to do with the issue before us here. But if the Court means to suggest otherwise, I point out that "restitution" in the judicial context commonly consists of money damages. See E. Farnsworth, Contracts § 12.20, p. 911 (1982). Accordingly, in *Acme Process Equipment Co.* v. *United States*, 171 Ct. Cl. 324, 357–358, 347 F. 2d 509, 529 (1965), the Court of Claims held that it had jurisdiction over claims for restitution, since they are not claims for specific relief. Although we reversed that judgment on the merits, we did not question its jurisdictional holding, but rather ourselves described the suit as one "to recover damages for breach of a contract." *United States* v. *Acme Process Equipment Co.*, 385 U. S. 138 (1966). The Court of Claims has continued to exercise jurisdiction over claims for restitutionary "damages" for breach of contract. See, *e. g.*, *Kurz & Root Co.* v. *United States*, 227 Ct. Cl. 522, 531–532 (1981); *Arizona* v. *United States*, 216 Ct. Cl. 221, 237–238, 575 F. 2d 855, 864–865 (1978).

cific relief, since the award of money undoes a loss by giving respondent the very thing (money) to which it was legally entitled. As the Court recognizes, however, the terms "damages" and "specific relief" have been "used in the common law for centuries," *ante*, at 897, and have meanings well established by tradition. Part of that tradition was that a suit seeking to recover a past due sum of money that does no more than compensate a plaintiff's loss is a suit for damages, not specific relief; a successful plaintiff thus obtains not a decree of specific performance requiring the defendant to pay the sum due on threat of punishment for contempt, but rather a money judgment permitting the plaintiff to order "the sheriff to seize and sell so much of the defendant's property as was required to pay the plaintiff." Farnsworth, Legal Remedies for Breach of Contract, 70 Colum. L. Rev. 1145, 1152 (1970). Those rare suits for a sum of money that were not suits for money damages (and that resulted at common law in an order to the defendant rather than a judgment executable by the sheriff) did not seek to compensate the plaintiff for a past loss in the amount awarded, but rather to prevent future losses that were either incalculable or would be greater than the sum awarded. *Id.*, at 1154; 5A A. Corbin, Contracts § 1142, pp. 117–126 (1964); H. McClintock, Principles of Equity § 60, p. 149 (2d ed 1948); T. Waterman, Specific Performance of Contracts § 20, p. 25 (1881). Specific relief was available, for example, to enforce a promise to loan a sum of money when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions. Almost invariably, however, suits seeking (whether by judgment, injunction, or declaration) to compel the de-

fendant to pay a sum of money[3] to the plaintiff are suits for "money damages," as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty. The present cases are quite clearly of this usual sort.

The Court's second theory, that "the monetary aspects of the relief that the State sought are not 'money damages,'" *ante*, at 893, is not only wrong, but it produces the same disastrous consequences as the first theory. As discussed above, see *supra*, at 913–915, and as the Court recognizes, see *ante*, at 905, and n. 40, the Claims Court has jurisdiction only to award damages, not specific relief. But if actions seeking past due sums are actions for specific relief, since "they undo the [Government's] refusal" to pay the plaintiff, *ante*, at 910, then the Claims Court is out of business. Almost its entire docket fits this description. In the past, typical actions have included suits by Government employees to obtain money allegedly due by statute which the Government refused to pay. See, *e. g.*, *Ellis* v. *United States*, 222 Ct. Cl. 65, 610 F. 2d 760 (1979) (claim under 5 U. S. C. § 8336(c), entitling law enforcement officers and firefighters to special retirement benefits); *Friedman* v. *United States*, 159 Ct. Cl. 1, 30–31, 310 F. 2d 381, 396–397 (1962) (claim under 10 U. S. C. § 1201 *et seq.*, entitling servicemen to disability retirement benefits), cert. denied *sub nom. Lipp* v. *United States*, 373 U. S. 932 (1963); *Smykowski* v. *United States*, 227 Ct. Cl. 284, 285, 647 F. 2d 1103, 1104 (1981) (claim under

---

[3] Suit for a sum of money is to be distinguished from suit for *specific* currency or coins in which the plaintiff claims a present possessory interest. Specific relief is available for that, through a suit at law for replevin or detinue, see generally, D. Dobbs, Law of Remedies § 5.13, p. 399 (1973); J. Cribbett, Cases and Materials on Judicial Remedies § 3, pp. 94–116 (1954), or through a suit in equity for injunctive relief, if the currency or coins in question (for example, a collection of rare coins) are "unique" or have an incalculable value. That is obviously not the case here. Respondent seeks fungible funds, not any particular notes in the United States Treasury.

42 U. S. C. §§ 3796–3796c, granting survivors' death benefits for public safety officers).   Another large category of the Claims Court's former jurisdiction consisted of suits for money allegedly due under Government grant programs that the Government refused to pay.   See, *e. g., Missouri Health & Medical Organization, Inc.* v. *United States*, 226 Ct. Cl. 274, 277–279, 641 F. 2d 870, 873 (1981) (grant awarded by Public Health Service); *Idaho Migrant Council, Inc.* v. *United States*, 9 Cl. Ct. 85, 88 (1985) ("The United States, for public purposes, has undertaken numerous programs to make grant funds available to various governmental and private organizations.   Many hundreds of grants are made each year to states, municipalities, schools and colleges and other public and private organizations. . . . Obligations of the United States assumed in [grant] programs . . . are within this court's Tucker Act jurisdiction").   All these suits, and even actions for tax refunds, see, *e. g., Yamamoto* v. *United States*, 9 Cl. Ct. 207 (1985), are now disclosed to be actions for specific relief and beyond the Claims Court's jurisdiction, since they merely seek "to enforce the statutory mandate . . . which happens to be one for the payment of money," *ante*, at 900.

Most of these suits will now have to be brought in the district courts, as suits for specific relief "to undo the Government's refusal to pay."   Alas, however, not all can be.   The most regrettable consequence of the Court's analysis is its effect upon suits for a sum owed under a contract with the Government.   In the past, the Claims Court has routinely exercised jurisdiction over a seller's action for the price. See, *e. g., Dairylea Cooperative, Inc.* v. *United States*, 210 Ct. Cl. 46, 535 F. 2d 24 (1976); *Northern Helex Co.* v. *United States*, 197 Ct. Cl. 118, 455 F. 2d 546 (1972); *Paisner* v. *United States*, 138 Ct. Cl. 420, 150 F. Supp. 835 (1957), cert. denied, 355 U. S. 941 (1958); *R. M. Hollingshead Corp.* v. *United States*, 124 Ct. Cl. 681, 111 F. Supp. 285 (1953).   But since, on the Court's theory, such a suit is not a suit for money damages but rather for specific relief, that jurisdiction

will have to be abandoned.  Unfortunately, however, those suits will not lie in district court either.   It is settled that sovereign immunity bars a suit against the United States for specific performance of a contract, see *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949), and that this bar was not disturbed by the 1976 amendment to § 702, see *Spectrum Leasing Corp.* v. *United States*, 246 U. S. App. D. C. 258, 260, and n. 2, 262, 764 F. 2d 891, 893, and n. 2, 895 (1985); *Sea-Land Service, Inc.* v. *Brown*, 600 F. 2d 429, 432–433 (CA3 1979); *American Science & Engineering, Inc.* v. *Califano*, 571 F. 2d 58, 63 (CA1 1978).   Thus, the Court of Appeals for the District of Columbia Circuit, applying the logic (which the Court has today specifically adopted as its own, *ante*, at 894–896, 901) of its earlier decision in *Maryland Dept. of Human Resources* v. *Department of Health and Human Services*, 246 U. S. App. D. C. 180, 763 F. 2d 1441 (1985), has held that a contractor cannot sue the Government in district court for the amount due under a contract, *not* because that would be a suit for money damages within the exclusive jurisdiction of the Claims Court, but because it is a suit for specific performance of the contract.   *Spectrum Leasing Corp.* v. *United States, supra*, at 262, 764 F. 2d, at 895.   But since the Claims Court is also barred from granting specific performance, the Court's theory, in addition to leaving the Claims Court without a docket, leaves the contractor without a forum.

I am sure, however, that neither the judges of the Claims Court nor Government contractors need worry.   The Court cannot possibly mean what it says today—except, of course, the judgment.   What that leaves, unfortunately, is a judgment without a reason.

## II

I agree with the Court that sovereign immunity does not bar respondent's actions insofar as they seek injunctive or declaratory relief with prospective effect.   An action seeking an order that will prevent the wrongful disallowance of fu-

ture claims is an action seeking specific relief and not damages, since no damage has yet occurred. Cf. *United States* v. *Testan*, 424 U. S. 392, 403 (1976) (distinguishing "between prospective reclassification, on the one hand, and retroactive reclassification resulting in money damages, on the other").

I do not agree, however, that respondent can pursue these suits in district court, as it has sought to, under the provisions of the APA, since in my view they are barred by 5 U. S. C. § 704, which is entitled "Actions reviewable," and which reads in relevant part:

> "Agency action made reviewable by statute and final agency action for which there is *no other adequate remedy in a court* are subject to judicial review."

The purpose and effect of this provision is to establish that the APA "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." Attorney General's Manual on the Administrative Procedure Act § 10(c), p. 101 (1947); see *Estate of Watson* v. *Blumenthal*, 586 F. 2d 925, 934 (CA2 1978); *Alabama Rural Fire Ins. Co.* v. *Naylor*, 530 F. 2d, at 1230; *International Engineering Co.* v. *Richardson*, 167 U. S. App. D. C. 396, 403, 512 F. 2d 573, 580 (1975); *Warner* v. *Cox*, 487 F. 2d 1301, 1304 (CA5 1974); *Mohawk Airlines, Inc.* v. *CAB*, 117 U. S. App. D. C. 326, 329 F. 2d 894 (1964); *Ove Gustavsson Contracting Co.* v. *Floete*, 278 F. 2d 912, 914 (CA2 1960); K. Davis, Administrative Law § 211, p. 720 (1951). Respondent has an adequate remedy in a court and may not proceed under the APA in the District Court because (1) an action for reimbursement may be brought in the Claims Court pursuant to the Tucker Act, and (2) that action provides all the relief respondent seeks.

The Tucker Act grants the Claims Court

> "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution,

or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U. S. C. § 1491(a)(1).

The Claims Court has not always clearly identified which of the several branches of jurisdiction recited in this provision it is proceeding under. It has held that Government grant instruments, although not formal contracts, give rise to enforceable obligations analogous to contracts. See, *e. g.*, *Missouri Health & Medical Organization, Inc.* v. *United States*, 226 Ct. Cl., at 278, 641 F. 2d, at 873; *Idaho Migrant Council, Inc.* v. *United States*, 9 Cl. Ct., at 89. The Medicaid Act itself can be analogized to a unilateral offer for contract—offering to pay specified sums in return for the performance of specified services and inviting the States to accept the offer by performance. But regardless of the propriety of invoking the Claims Court's contractual jurisdiction, I agree with the Secretary that respondent can assert a claim "founded . . . upon [an] Act of Congress," to wit, the Medicaid provision mandating that "the Secretary (except as otherwise provided in this section) *shall pay* to each State which has a plan approved under this subchapter" the amounts specified by statutory formula. 42 U. S. C. § 1396b(a) (emphasis added).

We have held that a statute does not create a cause of action for money damages unless it "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States* v. *Testan, supra,* at 400, quoting *Eastport S. S. Corp.* v. *United States*, 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1009 (1967). Although § 1396b(a) does not, in so many words, mandate damages, a statute commanding the payment of a specified amount of money by the United States impliedly authorizes (absent other indication) a claim for damages in the defaulted amount. See, *e. g.*, *Bell* v. *United States*, 366 U. S. 393, 398

(1961) (claim brought under statute providing that captured soldiers "shall be entitled to receive" specified amounts); *Sullivan* v. *United States*, 4 Cl. Ct. 70, 72 (1983) (claim brought under 5 U. S. C. § 5595(b)(2), providing that employees are "entitled to be paid severance pay" in specified amounts), aff'd, 742 F. 2d 628 (CA Fed. 1984) *(per curiam); Ellis* v. *United States*, 222 Ct. Cl. 65, 610 F. 2d 760 (1979) (claim under 5 U. S. C. § 8336(c), entitling law enforcement officers and firefighters to special retirement benefits); *Friedman* v. *United States*, 159 Ct. Cl., at 30–31, 310 F. 2d, at 396–397 (claim under 10 U. S. C. § 1201 *et seq.*, entitling servicemen to disability retirement benefits), cert. denied *sub nom. Lipp* v. *United States*, 373 U. S. 932 (1963); *Smykowski* v. *United States*, 227 Ct. Cl., at 285, 647 F. 2d, at 1104 (claim under 42 U. S. C. §§ 3796–3796c, granting survivors' death benefits for public safety officers); *Biagioli* v. *United States*, 2 Cl. Ct. 304, 306–307 (1983) (claim brought under 5 U. S. C. § 5596, providing that employees subject to unjustified personnel action are "entitled . . . to receive" backpay); see also *Testan, supra*, at 406 (dicta) ("Congress . . . has provided specifically . . . in the Back Pay Act [5 U. S. C. § 5596] for the award of money damages for a wrongful deprivation of pay").

I conclude, therefore, that respondent may bring an action in the Claims Court based on § 1396b(a). The Court does not disagree with this conclusion but does comment that "[i]t seems likely that while Congress intended 'shall pay' language in statutes such as the Back Pay Act to be self-enforcing—*i. e.*, to create both a right and a remedy—it intended similar language in § 1396b(a) of the Medicaid Act to provide merely a right, knowing that the APA provided for review of this sort of agency action." *Ante*, at 906, n. 42. I fail to understand this reasoning, if it is intended as reasoning rather than as an unsupported conclusion. The only basis the Court provides for treating differently statutes with identical language is that Congress knew "that the APA provided for review of this sort of agency action [*i. e.*, denial of

Medicare reimbursement]." *Ibid.* But that does not distinguish the Medicaid Act from any statute enacted after 1946 when the APA became effective, including the Back Pay Act, 5 U. S. C. § 5596, and most other statutory bases for Claims Court jurisdiction.

There remains to be considered whether the relief available in the Claims Court, damages for failure to pay a past due allocation, is an "adequate remedy" within the meaning of § 704. Like the term "damages," the phrase "adequate remedy" is not of recent coinage. It has an established, centuries-old, common-law meaning in the context of specific relief—to wit, that specific relief will be denied when damages are available and are sufficient to make the plaintiff whole. See, *e. g.*, 1 W. Holdsworth, A History of English Law 457 (7th ed. 1956) (by the 18th century "it was settled that equity would only grant specific relief if damages were not an adequate remedy"). Thus, even though a plaintiff may often prefer a judicial order enjoining a harmful act or omission before it occurs, damages after the fact are considered an "adequate remedy" in all but the most extraordinary cases. See, *e. g.*, *Schoenthal* v. *Irving Trust Co.*, 287 U. S. 92, 94 (1932); *Gaines* v. *Miller*, 111 U. S. 395, 397–398 (1884); 5A A. Corbin, Contracts § 1136, pp. 95–96, § 1142, pp. 117–120 (1964); H. Hunter, Modern Law of Contracts: Breaches and Remedies ¶ 6.01[3], pp. 6–7 to 6–8 (1986); Farnsworth, 70 Colum. L. Rev. 1154; cf. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1017 (1984). There may be circumstances in which damages relief in the Claims Court is available, but is not an adequate remedy. For example, if a State could prove that the Secretary intended in the future to deny Medicaid reimbursement in bad faith, forcing the State to commence a new suit for each disputed period, an action for injunctive relief in district court would lie. See, *e. g.*, *Franklin Telegraph Co.* v. *Harrison*, 145 U. S. 459, 474 (1892). Or if a State wished to set up a new program providing certain services that the Secretary had made clear his intention to dis-

allow for reimbursement, an action seeking a declaration as to the correct interpretation of the statute would lie, since it would be necessary to prevent the irreparable injury of either forgoing a reimbursable program or mistakenly expending state funds that will not be reimbursed. But absent such unusual circumstances, the availability of damages in the Claims Court precludes suit in district court under the provision of the APA permitting review of "agency action for which there is no other adequate remedy." See *Estate of Watson* v. *Blumenthal*, 586 F. 2d, at 934 (emphasis omitted); *Warner* v. *Cox*, 487 F. 2d, at 1304; *Mohawk Airlines, Inc.* v. *CAB*, 117 U. S. App. D. C. 326, 329 F. 2d 894 (1964); *Ove Gustavsson Contracting Co.* v. *Floete*, 278 F. 2d, at 914; cf. *Monsanto, supra*, at 1019 (equitable relief to enjoin taking barred since Tucker Act provides an "adequate remedy").[4]

The Court does not dispute that in the present cases an action in Claims Court would provide respondent complete relief. Respondent can assert immediately a claim for money damages in Claims Court, which if successful will as effectively establish its rights as would a declaratory judgment in district court. Since there is no allegation that the Secretary will not honor in the future a Claims Court judgment that would have not only precedential but collateral-estoppel effect, see *Montana* v. *United States*, 440 U. S. 147, 157–158, 162–163 (1979), the ability to bring an action in Claims Court

---

[4] Of course, many suits, both for specific relief and for damages, reach district court under the APA because they come within the more specific rubric of § 704, "[a]gency action made reviewable by statute." See, *e. g.* 42 U. S. C. § 405(g) (Social Security benefits); 42 U. S. C. § 1395*oo*(f) (reimbursement of Medicare providers). And even where no special review statute exists, the vast majority of specific-relief suits challenging agency action will reach district court because they are unaffected by the "other adequate remedy" provision of § 704, since they challenge the application of statutes or regulations that cannot be regarded as providing for damages. See, *e. g.*, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136 (1967) (suit challenging drug-labeling regulations).

with regard to disallowance decisions already made provides effective prospective relief as well.

Rather than trying to argue that the Claims Court remedy is inadequate in this case, the Court declares in a footnote that "[s]ince, as a *category of case*, alleged 'improper Medicaid disallowances' cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court." *Ante*, at 907, n. 43. This novel approach completely ignores the well-established meaning of "adequate remedy," which refers to the adequacy of a remedy for a particular plaintiff in a particular case rather than the adequacy of a remedy for the average plaintiff in the average case of the sort at issue. Although the Court emphasizes that the phrase "money damages" should be interpreted according to "the ordinary understanding of the term as used in the common law for centuries," *ante*, at 897, it appears to forget that prescription when it turns to the equally ancient phrase "adequate remedy." Evidently, whether to invoke "ordinary understanding" rather than novel meaning depends on the task at hand. In any event, were the Court's rationale taken seriously, it would (like the Court's novel analysis of "money damages" in § 702) divest the Claims Court of the bulk of its docket. It is difficult to think of a category of case that can "always be adequately remedied in the Claims Court." Nor is a categorical rule for challenges to Medicaid disallowance decisions justifiable on the basis that in *most* (not just some) such cases prospective or injunctive relief is required, and therefore it is efficient to have a bright-line rule. The traditional legal presumption (and the common-sense presumption) with respect to all other statutes that obligate the Government to pay money is that money damages are ordinarily an adequate remedy. I am aware of no empirical evidence to rebut that presumption with respect to Medicaid. Among the reported disallowance decisions, there appear to be none where a State has asserted a basis for prospective injunctive relief.

Nor can Medicaid disallowance cases be singled out for special treatment as a group because, as the Court declares, "[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets requires a different sort of review and relief process" than is provided in Claims Court, *ante*, at 904–905, n. 39, since the Medicaid Act is a "complex scheme . . . that governs a set of intricate, ongoing relationships between the States and the Federal Government," *ante*, at 901, n. 31. All aspects of this assertion are without foundation. The area of law involved here, Medicaid, is indistiguishable for all relevant purposes from many other areas of law the Claims Court routinely handles. Medicaid statutes and regulations are not more complex than, for example, the federal statutes and regulations governing income taxation or Government procurement, and the Government's relationship with the States is neither more intricate and ongoing nor uses a different kind of balance sheet than its relationship with many defense contractors or with large corporate taxpayers subject to perpetual audit. And I cannot imagine in what way district courts adjudicating Medicaid disallowance claims would apply "a different sort of review and relief process" so as to "manag[e] the relationships between States and Federal Governments." Just like the Claims Court, district courts adjudicate concrete cases, one at at a time, that present discrete factual and legal disputes.

Finally, the Court suggests that Medicaid disallowance suits are more suitably heard in district court with appeal to the regional courts of appeals than in the Claims Court with appeal to the Court of Appeals for the Federal Circuit, because (1) disallowance decisions have "state-law aspects" over which the regional courts of appeals have a better grasp, *ante*, at 908, (2) it is anomalous to have Medicaid compliance decisions reviewed in the regional courts of appeals while reviewing disallowance decisions in Claims Court, *ibid.*, and (3) it is "highly unlikely that Congress intended to designate an

Article I court as the primary forum for judicial review of agency action that may involve questions of policy," *ante*, at 908, n. 46.   I do not see how these points have anything to do with the question before us (whether the Claims Court can provide an adequate remedy in these cases), but even if relevant they seem to me wrong.   (1) Adjudicating a disallowance decision does not directly implicate state law.   As the present cases illustrate, the typical dispute involves only the interpretation of federal statutes and regulations.   I suppose it is conceivable that a state-law issue could sometimes be relevant—for example, the Government might contend that the State was, under state law, entitled to reimbursement for a particular expenditure from some third party and thus could not claim it against the Government.   But there is no area of federal law that does not contain these incidental references to state law, and perhaps none does so as much as federal tax law, which is, of course, routinely adjudicated in the Claims Court.   (2) It is not at all anomalous for the Claims Court to share jurisdiction over controversies arising from Medicaid. In fact, quite to the contrary, the Claims Court *never* exercises exclusive jurisdiction over any body of law, but only over particular types of claims.   (3) It is not more likely that Congress intended disputes involving "questions of policy" to be heard in district court before appeal to an Article III court, since it is the business neither of district courts nor of Article III appellate courts to determine questions of policy. It is the norm for Congress to designate an Article I judge, usually an administrative law judge, as the initial forum for resolving policy disputes (to the extent they are to resolved in adjudication rather than by rulemaking), with the first stop in an Article III court being a court of appeals such as the Federal Circuit—where, of course, the policy itself would not be reviewed but merely its legality and the procedures by which it was pronounced.   Ordinarily, when Congress creates a special judicial review mechanism using district courts, it is to get an independent adjudication of the facts, not an

unconstitutional judicial determination of policy. See, *e. g.*, 42 U. S. C. § 405(g).

* * *

Nothing is more wasteful than litigation about where to litigate, particularly when the options are all courts within the same legal system that will apply the same law.  Today's decision is a potential cornucopia of waste.  Since its reasoning cannot possibly be followed where it leads, the jurisdiction of the Claims Court has been thrown into chaos.  On the other hand, perhaps this is the opinion's greatest strength.  Since it cannot possibly be followed where it leads, the lower courts may have the sense to conclude that it leads nowhere, and to limit it to the single type of suit before us.  Even so, because I think there is no justification in law for treating this single type of suit differently, I dissent.